**John F. KNIGHT, Jr., et al., Plaintiffs and Plaintiff Intervenors,**

**United States of America Plaintiff,**

v.

**The State of ALABAMA, et al., Defendants.**

**No. CIV.A. CV–83–M–1676–.**

United States District Court, N.D. Alabama.

Oct. 5, 2004.

---

**17.** *Id.*

**18.** *See United States v. Doe,* 101 F.Supp. 609, 611 (D.Conn.1951).

Alice H. Martin, U.S. Attorney, U.S. Attorney's Office, Birmingham, AL, James U. Blacksher, Birmingham, AL, Craig M. Crenshaw, Jr., U.S. Department of Justice–Civil Rights Division, Educational Opportunities, Litigation Sec, Washington, DC, Jeremiah Glassman, U.S. Department of Justice, Civil Rights Division, Educational Opportunities Section, Washington, DC, Susan J. Watterson, Birmingham, AL, Sarah L. Thompson, Sarah L. Thompson, Attorney at Law, Northport, AL, Naomi Hosea Truman, Housing Authority of the Birmingham District, Birmingham, AL, Demetrius C. Newton, Birmingham, AL, James L. North, James L. North & Associates, Birmingham, AL, Deval L. Patrick, U.S. Department of Justice, Civil Rights Division, Criminal Section, Washington, DC, Leslie M. Proll, Naacp Legal Defense & Educational Fund Inc, Wash-

ington, DC, Sharon D Simmons, U.S. Attorney's Office, Birmingham, AL, for U.S. of America, Plaintiff.

Edward S. Allen, Balch & Bingham LLP, Birmingham,AL, Gregory M. Biggs, State of Alabama Department of Corrections Legal Division, Montgomery, AL, M. Stanford Blanton, Balch & Bingham LLP, Birmingham, AL, Ernest N. Blasingame, Jr., Florence, AL, David R. Boyd, Balch & Bingham LLP, Montgomery, AL, Richard F. Calhoun, Calhoun Faulk Watkins Clower & Cox, Troy, AL, J. Russell Campbell, Balch & Bingham LLP, Birmingham, AL, Milton C. Davis, Tuskeegee, AL, Terry G. Davis, Davis & Hatcher LLC, Montgomery, AL, Armand G. Derfner, Derfner Altman & Wilborn LLC, Charleston, SC, Jeffery A. Foshee, Foshee & George LLC, Montgomery, AL, Edward M George, Foshee & George LLC, Montgomery, AL, Fred D. Gray, Gray Langford Sapp, McGowan Gray & Nathanson, Tuskegee, AL, Stanley F. Gray, Gray Langford Sapp, McGowan Gray & Nathanson, Tuskegee, FL, Edgar R. Haden, Balch & Bingham LLP, Birmingham, AL, Robert M. Hill, Jr., Robert M. Hill Jr., Florence, AL, Robert D. Hunter, Altec Inc, Birmingham, AL, Jim R. Ippolito, Jr., Alabama Department of Transportation, Montgomery, Carl E. Johnson, Jr., Bishop Colvin Johnson & Kent, Birmingham, AL, Michael G. Kendrick, Waldrep Stewart & Kendrick LLC, Birmingham, AL, Robin G. Laurie, Balch & Bingham LLP, Montgomery, AL, Norma M. Lemley, University of Alabama System University Counsel, Tuscaloosa, AL, Thomas M. Lovett, University of North Alabama, Florence, AL, Richard N. Meadows, State of Alabama, Personnel Department, Montgomery, AL, Larry T. Menefee, Montgomery, AL, Stanley J. Murphy, Murphy & Murphy LLC, Tuscaloosa, AL, William F. Murray, Jr., Burr & Forman LLP, Birmingham, AL, Darnell D. Coley, State of Alabama Department of Education, Montgomery, AL, Larry E. Craven, Alabama Department of Education, Montgomery, AL, Robert W. Rieder, University of Alabama System, Huntsville, AL, C. Glenn Powell, University of Alabama System, Office of Counsel, Tuscaloosa, AL, William K. Thomas, Cabaniss Johnston, Gardner Dumas & O'Neal, Birmingham, AL, Jean Walker Tucker, University of South Alabama, Mobile, AL, Mark T. Waggoner, Hand Arendall LLC, Birmingham, AL, Joseph A. Wallace, Elkins, WV, Joe R. Whatley, Jr., Whatley Drake LLC, Birmingham, AL, Michael R. White, Sr., Alabama Department of Education, Montgomery, AL, R. M. Woodrow, Doster & Woodrow, Anniston, AL, Reginald L. Sorrells, Alabama Department of Education, Montgomery, AL, John B. Tally, Jr., Adams & Reese/Lange Simpson LLP, Birmingham, AL, Gerald A. Templeton, The Templeton Group PC, Birmingham, AL, for Alabama, State of, Defendant.

Whit Colvin, Bishop Colvin Johnson & Kent, Birmingham, AL, for University of Montevallo, Defendant.

J. Cecil Gardner, Gardner Middlebrooks Gibbons Kittrell Olsen Walker & Hill PC, Mobile, AL, for Jonathan R. Borden, Dr. Robert W. Drakeford, Movants.

William F. Gardner, Cabaniss Johnston, Gardner Dumas & O'Neal, Birmingham, AL, for Alabama, State of, Troy State University, Defendants.

C. A. Gonzalez, Atlanta, GA, for Carlos A. Gonzalez, Miscellaneous Pro se.

Edward A. Hosp, Maynard Cooper & Gale PC, Birmingham, AL, for Board of Trustees of University of Alabama, Defendant.

Mary Kirby, United States District Court Northern District of Georgia, Rome, GA, for Mary Kirby, Miscellaneous.

Michael Vance McCrary, Gardner Middlebrooks Fleming Gibbons & Kittrell, Bir-

mingham, AL, for Joe L. Reed, Intervenor Defendant.

Candis A. McGowan, John D. Saxon PC, Birmingham, AL, for Jonathan R. Borden, Dr. Robert W. Drakeford, Movants.

Ramadanah M Salaam, Thomas Means Gillis & Seay, PC, Montgomery, for Alabama State University Board of Trustees, Defendant.

Braxton Schell, Jr., Braxton Schell Jr. PC, Birmingham, AL, for Alabama, State of, Alabama A & M University (AAMU), Defendants.

Solomon S. Seay, Jr., Solomon S. Seay Jr. PC, Montgomery, AL, for Alabama, State of, Alabama State University Board of Trustees, Defendants.

Kenneth L Thomas, Thomas Means Gillis & Seay, PC, Montgomery, for Alabama State University Board of Trustees, Defendant.

Kimberly C. Walker, Gardner Middlebrooks, Gibbons Olsen & Walker PC, Mobile, AL, for Joe L. Reed, Intervenor Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

MURPHY, District Judge.

This is a desegregation lawsuit involving all public universities in the State of Alabama and a plaintiff class consisting of all black citizens of the State of Alabama. The case is before the Court on Plaintiffs' Motion for Additional Relief with Respect to State Funding of Public Higher Education [3205].

## I. Background

### A. Summary of the *Knight* Litigation

1. On January 15, 1981, John F. Knight, Jr. and a class of other alumni, students, and faculty members of Alabama State University ("ASU") filed this lawsuit in the Middle District of Alabama, attacking vestiges of discrimination in the State of Alabama's public higher education system. *Knight v. Alabama,* 787 F.Supp. 1030, 1048 (N.D.Ala.1991) (*"Knight I"*). The Court subsequently held two bench trials, the first in 1991, which lasted six months, and the second in 1995, which lasted six weeks. In both of those bench trials, the Court found that the vestiges of segregation remained within the Alabama system of public higher education, and that those vestiges violated Title VI of the Civil Rights Act of 1964 as well as the Federal Constitution. *Knight I,* 787 F.Supp. at 1368; *Knight v. Alabama,* 900 F.Supp. 272, 280–81 (N.D.Ala.1995) (*"Alabama II"*).

2. As a result of the Court's findings in those bench trials, the Court has fashioned and approved a number of remedies, too voluminous to recount here. Those remedies are calculated to eliminate the vestiges of historical discrimination within the Alabama system of public higher education. The Court has also retained active jurisdiction over the case to the present time. Pursuant to this jurisdiction, the Court has appointed a Monitor and an Oversight Committee to oversee on a daily basis the administration of the Court-ordered remedies in this litigation. The Court also conducts periodic reviews of the effectiveness of the Court-ordered remedies.

### B. Plaintiffs' Claims

3. Plaintiffs contend that serious underfunding of the Educational Trust Fund ("ETF"), from which appropriations are made for both K–12 and higher education, has jeopardized the success of the remedies crafted by the Court to eliminate the vestiges of historical discrimination in the State of Ala-

bama's system of public higher education.

4. Plaintiffs claim that adequate state funding is necessary for fashioning an effective, educationally sound, and practicable remedy for the State of Alabama's history of *de jure* racial discrimination. Specifically, Plaintiffs claim that adequate funding is necessary for: (1) recruiting and retaining of black faculty members and high-ranking administrators at historically white institutions ("HWI"); (2) providing ASU and Alabama A & M University ("AAMU") with the necessary resources to overcome a century of underfunding by the State; (3) providing AMU and AAMU the ability to fund adequately scholarships to attract other-race students after the Court-ordered scholarships expire; and (4) developing new, high-quality programs at ASU and AAMU, including the capital facilities and faculty necessary to operate them.

5. According to Plaintiffs, severe cuts in state funding have severely impeded the ability of ASU and AAMU to implement successfully remedial programs calculated to spur growth in academic, research, and public service functions. Plaintiffs specifically point to Alabama's property tax system, which Plaintiffs claim is unfair, inadequate, and unconstitutional. Plaintiffs argue that because of low and inadequate property taxes, which are intended to be the primary source of K–12 funding, the State of Alabama has been forced to allocate an increasingly greater percentage of funds from the ETF to K–12 appropriations. As a result, over the past several years, all of the public state universities have been forced to increase tuition dramatically. Plaintiffs submit that the State's tax burden disproportionately falls on the low-income portion of the population, which remains predominately black, and consequently acts as a barrier against blacks obtaining public higher education.

6. Plaintiffs claim that the State's tax system is traceable to a prior *de jure* segregation regime. Specifically, Plaintiffs contend that the restrictions on the amount of taxes that can be levied on real property are directly traceable to a policy of shielding the real property of white landowners from taxes that would benefit the education of blacks—a policy that Plaintiffs claim persists to this day. Plaintiffs identify six provisions of the Alabama Constitution that they claim are traceable to a legislative intent to preserve racial segregation throughout the State's system of public education and thwart and deny blacks an equal opportunity to obtain the benefits of public higher education in Alabama.

7. Those provisions are:

(1) Ala. Const. § 214, as amended, which limits the rate of ad valorem taxation the Alabama Legislature may place on taxable property;

(2) Ala Const. § 215, as amended, which limits the rate of ad valorem taxation counties may place on taxable property;

(3) Ala. Const. § 216, as amended, which limits the rate of ad valorem taxation municipalities may place on taxable property;

(4) Ala. Const. § 269, as amended, which limits the rate of ad valorem taxation counties may place on taxable property for the benefit of public education, and which further requires approval of those property taxes by the voters in a referendum election;

(5) Ala. Const. Amendment 325, as amended, which establishes separate classes of property for purposes of ad valorem taxation, lowers assessment ra-

tios, requires voter approval of all property tax increases, and establishes a cap or "lid" on total ad valorem taxes; and (6) Ala. Const. Amendment 373, which amends the property classes subject to taxation, lowers further the assessment ratios, establishes the current use method of property assessment, and establishes lower "lids" on total ad valorem taxes.

8. Plaintiffs contend that those six constitutional provisions, as well as laws enacted pursuant to those provisions, effectively segregate the races and deny equal opportunity to African–Americans. Plaintiffs therefore request that the Court:

(1) enter a declaratory judgment that the those six constitutional provisions violates the Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution, the Civil Rights Act of 1866, 42 U.S.C.A. §§ 1981 and 1982, and Title VI of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000d *et seq.*;

(2) enjoin officials of the State of Alabama, pursuant to the Civil Rights Act of 1971, 42 U.S.C.A. § 1983, from enforcing the allegedly unconstitutional policies and practices relating to the funding of public education and from failing to reform those policies and practices in an educationally sound and practicable manner so as to remedy the racial discrimination those policies and practices allegedly perpetuate;

(3) order the State of Alabama to reform the State's tax system within one year in such a manner that both eliminates the vestiges of *de jure* racial discrimination in public school funding and provides adequate funding for public higher education, without denying adequate and equitable funding to K–12 schools;

(4) enjoin the State, if it fails to enact remedial obligations within the time permitted, from reducing current state and local ad valorem millage rates and from enforcing Amendments 325 and 373 to the Alabama Constitution and order the State to apply state and local millage rates uniformly to all taxable property assessed at no less than sixty percent of its fair market value; and

(5) grant Plaintiffs an award of attorneys' fees and expenses.

## C. Procedural History

9. On July 28, 2003, Plaintiffs filed their Motion for Additional Relief with Respect to State Funding of Public Higher Education. On October 29, 2003, Plaintiffs filed a Motion for Partial Summary Judgment Regarding Their Motion for Additional Relief with Respect to State Funding of Public Higher Education. On January 8, 2004, the Court held a hearing with respect to Plaintiffs' Motion for Summary Judgment, and on January 28, 2004, the Court entered an Order granting an evidentiary hearing with respect to Plaintiffs' Motion for Additional Relief with Respect to State Funding of Public Higher Education. The Court subsequently denied without prejudice Plaintiffs' Motion for Partial Summary Judgment.

10. From May 4 to 5, 2004, the Court held an evidentiary hearing with respect to Plaintiffs' Motion for Additional Relief with Respect to State Funding of Public Higher Education. The Court now resolves that Motion.

## II. Findings of Fact

### A. Property Tax Policies Traceable to *De jure* Segregation

#### 1. The 1819 Constitution

11. On March 2, 1819, Alabama was admitted to statehood. (Pls.' Request for Admissions ¶ 17.) The act of

Congress admitting Alabama to statehood continued the practice of reserving the sixteenth section of every township as a permanent endowment for public schools and reserving one of two full townships as an endowment for a state university. (*Id.*) The statewide total of sixteenth section public school lands was approximately one million acres. (*Id.* ¶ 18.) The inhabitants of the townships, rather than the State government of Alabama, owned those public school lands; therefore, the 1819 Constitution could only require that the Alabama Legislature preserve the lands from unnecessary waste or damages and apply funding, which could be raised from such lands, in accordance with the purpose of such grants. (*Id.* ¶ 19.)

12. Taxation and appropriations for public education under the 1819 Constitution were statutorily governed—the constitution simply "encouraged" education and gave the General Assembly plenary power to raise funds for schools, as well as the state university. 1819 Ala. Const. Art. on Education. The Alabama Legislature established local mechanisms for leasing the sixteenth section lands for public schools: school commissioners were authorized to be appointed by the county court to manage the sixteenth section lands and to appoint trustees for each school district. (Pls.' Request for Admissions ¶ 20.) Rents from the leases of the sixteenth section lands were initially disappointingly low, and pressure began to build to sell those lands. (*Id.* ¶ 21.)

13. In 1823, the Alabama Legislature established a state bank because private banks were unable to satisfy the demands of borrowers, who sought capital funds to buy, among other things, slaves and land. (Pls.' Request for Admissions ¶¶ 22–23.) To provide lending capital for the state bank, the Alabama Legislature successfully petitioned Congress in 1827 to authorize the State to sell the sixteenth section lands with the consent of the inhabitants of the townships that owned the lands. (*Id.* ¶¶ 24–25.) Congress also specified that the proceeds of such sales must be devoted exclusively to the use of public schools. (*Id.* at ¶ 25.)

14. In 1828, the Legislature established procedures for selling the sixteenth section lands. (Pls.' Request for Admissions ¶ 26.) Among the purchasers were speculators, many of whom were authorized by law to pay for their land purchases over time. (*Id.*) The proceeds of the land sales were required to be deposited into the state bank, where they became an additional source of capital for borrowers. (*Id.* ¶ 27.) On January 15, 1828, by act of the Legislature, the State assumed fiduciary responsibility of the proceeds of the sales of sixteenth section lands, and became obligated to pay interest directly to the townships and school districts. (*Id.* ¶ 28.)

15. School land purchasers eventually found that their investments outstripped profits, and consequently failed to make payments. (Pls.' Request for Admissions ¶ 29.) In 1843, the state bank failed, and $1.3 million derived form the sales of sixteenth section lands and over $300,000 from the sale of the university lands were lost. (*Id.* ¶¶ 30–31.) In 1848, the Legislature committed the State to pay interest at six percent of the indebtedness in perpetuity. (*Id.* ¶ 32.)

16. Most of the antebellum public schools were concentrated in the Black Belt,

a fertile region of the State, so named for the dark color of the soil. (May 4, 2004, Tr. at 103–04.) The high concentration of schools in that region was a result of both the relative high value of the land in that region and the Whiggish residents of the Black Belt counties who tended to value formal education more than the Jacksonian Democrats residing elsewhere in the State. (Dep. of Dr. J. Mills Thornton at 26–29.)

17. On February 14, 1854, the Legislature established a statewide public school system, authorizing each county to levy a one mill school tax on real and personal property without the requirement of voter approval by referendum. (Pls.' Request for Admissions ¶ 20.) Revenue generated from the school tax was paid directly into the county treasury. (*Id.*) The 1854 school statute required local jurisdictions to submit the proceeds from the sixteenth section land grants to the State, which would redistribute the funds based on the number of students in each school system. (Thornton Dep. at 23–25.)

18. Before the Civil War, the slave tax and ad valorem taxes land were the principal source of revenue for county governments. (Thornton Dep. at 11–14.) For most of the antebellum period, however, "essentially none" of the revenues from the slave tax and ad valorem taxes went to public schools. (*Id.* at 21.) Funding for public schools instead depended on the revenues obtained from the lease of sale of the sixteenth section land grants. (*Id.* at 22–23.) Beginning in

1847, the Black Belt counties succeeded in changing the statutory law to shift more of the tax burden from slaves to an ad valorem tax on land, which benefited taxpayers in the Black Belt counties because those taxpayers generally owned more slaves than other residents in the Hill and Wiregrass counties. (*Id.* at 19–21, 26–29.) During the five years proceeding the Civil War, the amount of ad valorem land tax collected by the State surpassed revenue generated from the slave tax. (*Id.* 20–21.) By 1861, the 1854 public school fund was producing an annual revenue of about $250,000. (*Id.* at 33.)

### 2. The 1861 and 1865 Constitutions

19. The 1861 Secessionist Constitution and the 1865 Presidential Reconstruction Constitution retained the provisions of the 1819 Constitution with respect to education. (Thornton Dep. at 32–33.) Those Constitutions, like the 1819 Constitution, did not restrict the Legislature's plenary authority to regulate the funding and operation of public education. (*Id.* at 33–34.)

### 3. The 1867–68 Constitution

20. In 1867 a new state constitution, also known as the Radical Reconstruction Constitution, was drafted, and in 1868 it was ratified (the "1868 Constitution"). (Thornton Dep. at 34.) The 1868 Constitution established a centralized public school system, including the University of Alabama, under the control of a state board of education. (*Id.* at 34–36.)

21. The 1868 Constitution also authorized the Legislature to levy a state poll tax[1] of $1.50 for the use of public

---

1. A "poll tax" at this time was not a tax levied at the voting place; rather, it was simply a head tax levied on all residents. (Thornton Dep. at 54.) "And that ... would create

some local support for the schools because that poll tax revenue in ... each district in each township would go directly to the town-

schools, and centralized all the sixteenth section lands under the control of the State Board of Education. (Thornton Dep. at 38–39.) Local school districts also received the power to levy a poll tax to be used for local education. (Pls.' Request for Admissions ¶ 41; Thornton Dep. at 37–38.) Additionally, all federal lands granted for education purposes, as well as a tax levied on industrial and commercial corporations, were earmarked for education. (Pls.' Request for Admissions ¶ 41.) The 1868 Constitution also placed a duty on the Legislature to limit the taxing authority of local governments; however, no constitutional limit was specified. (*Id.* ¶ 42 (quoting 1868 Ala. Const. Art. XIII § 16).)

22. Although the schools in Alabama were segregated while the 1868 Constitution was in effect, the State Board of Education exercised special legislative powers to mandate that state public school funds be distributed on a per capita basis, without regard to race. (Thornton Dep. at 37–38.)

23. In addition to the poll tax and the proceeds of the sixteenth section lands, the 1868 Constitution required that all property, not just land, be assessed on a uniform ad valorem basis. (Thornton Dep. at 40.) Further, "because the tax assessors [were] radical Republican officials and they [had] no particular interest in protecting well-to-do white property holders, virtually none of whom were Republicans, there ... was quite an aggressive effort to make sure that ... these values were accurate." (*Id.* at 42.) Consequently, the ad valorem general property tax gen-

erated substantial revenue, doubling the State revenues for public education from amounts received prior to the Civil War. (*Id.*) The University of Alabama, which was barely functioning with a few students on $36,000 income from the lost land grant did not receive any of those public school funds, however. (*Id.* at 42–48.)

24. During the Radical Reconstruction, white small farmers found themselves paying substantially higher taxes on their property, yet receiving fewer public benefits because the State was distributing those funds equally among white and black schools. (Thornton Dep. at 53–55.) Whites resented having to pay for the education of blacks, who paid relatively few taxes, and that resentment fueled accusations of mismanagement and abuse of public funds—*i.e.* that their increased taxes were simply lining the pockets of white carpetbaggers and radical officials. (*Id.* at 50–52.) As a result, poorer white landowners became motivated to cooperate with wealthier whites to form a "sort of all white alliance of the Democratic party," united for reducing taxes and establishing supremacy for whites. (*Id.* at 55–56.) On the other side of the political line were the Republicans, who were essentially blacks and a handful of their white allies, carpetbaggers, and scalawags. (*Id.* at 55–56.)

25. Following the failure of railroads whose bonds had been guaranteed by the State and the Panic of 1873, funding for public education became increasingly strained. (Thornton Dep. at 59–60.) As discussed in the next section, funding for public education

---

ship. And the poll tax that was collected from whites would go to the white school and

the poll tax that was collected from blacks would go to black schools." (*Id.* at 38–39.)

fell even more following the ratification of a new constitution in 1875. (Pls.' Request for Admissions ¶ 53.)

### 4. The 1875 Constitution

26. Because the 1868 Constitution provided for legislative apportionment on the basis of total population, and because blacks were counted for the first time, legislative power shifted from the white counties to the Black Belt counties. (Thornton Dep. at 56–57.) Although blacks constituted a large portion of the population in the Black Belt counties, after Redemption, blacks were controlled by intimidation and fraud, so as to permit a small number of whites in the Back Belt counties to exercise disproportionate power in the Legislature. (*Id.*)

27. In 1875, whites from the Black Belt, concerned that a black majority might regain political power and raise taxes, placed in the constitution millage caps for both state and local property taxes. (Thornton Dep. at 60–69; Pls.' Request for Admissions ¶ 51.) The 1875 Constitution thus became the first Alabama constitution to place strict constitutional limits on the ability of both the State and local governments to tax property. (Thornton Dep. at 60–69; Pls.' Request for Admissions ¶ 51.)

28. Specifically, the 1875 Constitution established a maximum tax rate of seven and one half mills, which was the same legislatively established rate that had been assessed under the 1868 Constitution, and a maximum tax rate of five mills for counties and municipalities. (Thornton Dep. at 65–66.) Racial motives permeated the establishment of constitutional caps on millage rates:

[D]uring Reconstruction, the experience of [Black Belt] whites had been a county government which was controlled by blacks and their Republican allies and which had very heavily taxed them, and taxed them for purposes that they largely regarded as illegitimate, such as the education of the Freedmen. Now that they had power back into their own hands, they were intent on ... using that new control to protect themselves from the possibility that the black majority in their counties would ever again be able to use that political power ... to tax them in a way that would force them as the property holders to cough up the funds, ... which would be used to the benefit of the majority of the people in the Black Belt who were black and essentially nonproperty holding .... And so they wanted to write into the Constitution permanent protections.

(Thornton Dep. at 67–68.)

29. Whites living in the Black Belt counties also used their influence over local tax assessors to reduce property assessments in the Black Belt far below market value, which disadvantaged other white counties. (Thornton Dep. at 60–69.) Additionally, the legislative sessions that followed ratification of the 1875 Constitution further lowered the millage rate from 7.0 mills in 1877 to 4.0 mills in 1890 so as to shield property from taxation. (Pls.' Request for Admissions ¶ 54.)

30. From 1875 to 1891, black schools received a proportionate amount of school funding. (Thornton Dep. at 78.) In 1891, however, the Apportionment Act was enacted, thereby giving discretionary authority to local school trustees to apportion funds among schools. (*Id.* at 80–81.) As a result, funding destined for black schools was diverted to white schools

all over the State. (*Id.* at 81.) "But of course in the majority Black Belt townships, ... this ha[d] an enormous and devastating effect on black education." (*Id.*)

31. The 1891 Apportionment Act also had an impact on the politics of property taxes. (Thornton Dep. at 81, 83.) By diverting funds from black schools to white schools, there was less of a need for additional property taxes in Black Belt counties because white schools were being funded adequately. (*Id.* at 82.) Consequently, the Black Belt whites, due to total population apportionment, were able to thwart attempts by reformers in urban areas and in white counties to raise taxes to increase funding for public schools. (*Id.*)

### e. The 1901 Constitution

32. Disfranchising blacks and maintaining white supremacy were the central purposes of the 1901 Constitution. (Thornton Dep. at 97, 119.) Indeed, the public school funding provisions of the 1901 Constitution are directly traceable to the 1875 Constitution, and propertied interests in the State were successful once again in protecting their financial interests. (Pls.' Request for Admissions ¶ 67.)

33. Black Belt whites were willing to support legal disfranchisement of blacks in the 1901 Constitution, and thus relinquish their control over state politics through control of the large black voting populations, out of fear that events at the national level would eventually lead to the re-enfranchisement of blacks, thus placing whites' property in danger of being taxed to support education for blacks. (Thornton Dep. at 100–06.) The ensuing compromise between the whites in the 1901 constitutional convention was that the white counties would

effectively control the executive offices of the State, while the Black Belt counties would control the Legislature. (*Id.* at 105.) This arrangement assured that the Black Belt could thwart attempts to increase property taxes. (*Id.*)

34. Considerable support existed for dividing funds for public education according to the taxes paid by each race. (Pls.' Request for Admissions ¶ 65.) Racial feelings, based on social and economic rivalry with blacks, had always run high among the poorer whites. (*Id.*)

35. White delegates from black counties, however, defeated the racial apportionment of taxes because it was against those whites' interests in securing a greater share of school revenues, which the whites were already allocating disproportionately to their white schools. (Pls.' Request for Admissions ¶ 64.)

36. The urban industrialists and Black Belt planters who controlled the 1901 constitutional convention preserved the 7.5 total millage cap that existed under the 1875 Constitution: the cap on state property taxes was reduced to 6.5 mills, but counties were authorized to levy up to 1.0 mills for schools. (Thornton Dep. at 108–11.) The 1.0 mill optional county tax for schools contained for the first time in Alabama history a voter referendum requirement, which was crafted to ensure, with disfranchisement, that only whites could give their consent to higher local property taxes. (*Id.* at 106–07, 115–16; Pls.' Request for Admissions ¶ 66.) This general hostility to home rule in the 1901 Constitution, as well as the 1875 Constitution, was motivated at least in part by race: "white control of the state govern-

ment ... is an important fall-back provision for guaranteeing the maintenance of white supremacy in majority black counties. And so it's important not to have too much power in the hands of the counties, or to make sure that the power ... that is at the local level is in safe, that is, Democratic and white hands." (Thornton Dep. at 92.) White supremacy was unquestionably the dominant view of education for all the members of the 1901 constitutional convention:

[T]here is a wide variety of opinions about ... the interaction of education and race. There are delegates who believe that blacks should receive essentially only vocational education. And there, on the other hand, are delegates who believe that over a long period of time through the educational mechanism, it might be possible to improve the status of blacks. There is nobody at the convention who is not a white supremacist, but there are varieties of opinions about ... whether white supremacy is an immediate necessity or whether white supremacy will always exist because of inherent differences between the races. And everything in between. That's a whole spectrum of opinions. I doubt, however, that there was anyone in the white counties who needed to be convinced, at least of the immediate necessity, of white supremacy. There is nobody at the convention who's not a white supremacist.

(*Id.* at 111–12.)

37. Once blacks were disfranchised by the 1901 Constitution, whites became more willing to support public education. (Thornton Dep. at 123.) In the Black Belt counties, support existed for a new teacher certification law, uniform textbooks, and redistricting. (Pls.' Request for Admissions ¶ 73.) The local tax privilege, however, was not popular in the Black Belt counties-by 1914, of the forty-six counties in Alabama that had levied a local school tax, only one (Marengo) was in the Black Belt. (*Id.*)

38. During the Progressive Period preceding World War I, the Legislature made three attempts to increase funding for education. First, a state board of equalization was created to police county tax assessors in an effort to remedy unreasonably low tax assessments. (Thornton Dep. at 125–26.) Second, in 1911, the Legislature passed a statute, which in 1935, was later slightly amended, establishing a sixty percent assessment ratio for all property. (*Id.* 126–27.) Third, in 1915, after school revenues again fell beneath expectations, Amendment 3 was ratified, which authorized counties to levy an additional one mill for schools and lowered the referendum margin from three fifths to a simple majority of those voting. (*Id.* at 129–30.)

39. In 1933, an constitutional amendment was ratified authorizing an income tax. (Thornton Dep. at 137–38.) The amendment provided that the proceeds of the income tax would first fund the State's floating debt, then would be allocated to a long term reduction of the State property tax. (*Id.* at 138.) That amendment did not restrict the authority of local governments to levy property taxes. (*Id.*)

40. In 1927, inasmuch as the constitutional caps on state and local taxation of personal property required other forms of taxation to raise revenue, the Legislature by statute segregated public school funds from general funds in the State budget, creating what was then called the Special Education Trust Fund. (Thornton Dep. at

142–43.) In 1935, the Legislature also statutorily enacted the State's first sales tax and created the Minimum Program Fund for schools. (*Id.*) The establishment of the Special Educational Trust Fund and the Minimum Program Fund represented substantial advances in the funding of public schools in the State. (*Id.* at 143.) Prior to the establishment of the income tax, sales tax, Special Educational Trust Fund, and the Minimum Program Fund, state universities had received appropriations from other state revenues—*i.e.* the State property tax. (*Id.* at 143–44.)

41. In 1947, the state income tax was earmarked for K–12 teacher salaries by Amendment 61 to the Constitution of 1901. (May 4, 2004, Tr. at 155.)

### f. Amendments 325 and 373

42. The impact of *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), on white Alabamians' support for public education varied according to how seriously they took the threat of federally mandated school desegregation:

For many years after *Brown* the feeling was quite widespread in the South that there simply was going to be no way that the federal government would ever have the power to bring integration to the state. There was no sense . . . that integration was impending or even very likely. And if you are quite confident that that's true, then you can continue to be an advocate of increased funding for the schools and the confidence that these schools . . . will continue segregated.

If, on the other hand, you believe that there is some real likelihood that schools will be integrated, then you would have very much more substantial doubts because all political leaders at this period said, and some actually believed, that the outcome of the integration of the schools would be the abolition of the schools. Certainly Governor John Patterson was, not merely in rhetoric but actually in his heart, . . . to the abolition of the public school system of the state if integration came to the state, or particular school districts, . . . if there was no likelihood that it was going to become statewide, he was prepared to close them in particular districts and leave them open elsewhere.

And Governor Wallace, I think actually welcomed the thought of general conversion to a system . . . of private segregated academies if there continued to be some form of public funding that did not go to the school, but instead went to the parents in the form of tuition grants or scholarships, . . . which the parents could then use to send their child to the segregated private academy.

(Thornton Dep. at 163–64.)

43. An attempt was made to raise the constitutional limit on local property taxes in 1955, but it was defeated. (Pls.' Request for Admissions ¶ 80.) The rate of ad valorem taxation which was constitutionally fixed at a maximum of 7.0 mills had not been changed since Amendment 3 was approved in 1916. (*Id.* ¶ 81.) Permissive legislation and the required constitutional amendments had granted thirteen county and twenty-three city school districts the right to raise their school ad valorem taxes, with the highest rates being 17.5 mills. (*Id.*) The local school tax amendment would have allowed the addition of another 5.5 mills to the allowable seven mills to produce a total of 12.5 mills for school purposes when local citizens so desired. (*Id.*) But the vot-

ers rejected those tax increases over which they had control; these included taxes to benefit education. (*Id.*) The same 1955 legislature increased the tax rate 16.67 percent on gasoline to raise $50 million for highways and levied for welfare a tobacco tax to raise $2.4 million and increased taxes on alcoholic beverages and corporations. (*Id.*) The people of the State had no chance to vote against those issues, but they did exercise their prerogative to disapprove taxes when the school tax amendments were placed before them. (*Id.*) The constitutional amendments affecting education were all soundly defeated at the polls on December 6, 1955. (*Id.*) This defeat threw education in Alabama into the worst proration of funding since the depression. (*Id.*)

44. On December 20, 1955, the voters approved Amendment 111, which this Court found to have "adopted most of the recommendations of the 1954 Interim Legislative Committee report for the racially discriminatory purpose of preserving segregation in the public elementary and secondary schools of the state." (Pls.' Request for Admissions ¶ 82 (citing *Alabama I*, 787 F.Supp. at 1104).) The legislature and citizens denied additional taxes for the support of public education, a condition which lasted until 1963 and from which it took education many years to recover. (Pls.' Request for Admissions ¶ 83.) This provision remains unchanged today, and the support of public education is constitutionally permitted but not required in Alabama. (*Id.*)

45. As the threat of school desegregation intensified, legislative enthusiasm for funding public schools sharply diminished. (Pls.' Request for Admissions ¶ 84.) Particularly in the Black Belt, whites

were committed to the idea that public education could not continue if in fact it was ordered to occur on an integrated basis. The schools would simply have to be closed; public education would have to end because an integrated education was not acceptable. [W]ith that as a fundamental first priority, any efforts to raise property tax, increase any kind of funding of schools, was in serious trouble and of great question until the matter of school integration was settled. And so when there were funding crises in education in the 1950's, . . . it was very difficult to get support for that even when it was advocated by the staunchest of segregationists like Governor John Patterson, who understood that the white schools needed money, the universities needed money, but he also had to announce . . . this is with . . . the understanding that any new funding occurs only with the understanding that schools stay separate.

(May 4, 2004, Tr. at 97.)

46. The 1959 Legislature authorized the creation of independent school districts throughout the state. Acts 1959, 2nd Ex.Sess., No. 126, p. 198. (Pls.' Request for Admissions ¶ 85.)

47. In 1962, at Governor Patterson's request, the Legislature passed a constitutional amendment authorizing county commissions to increase property taxes by 5 mills, subject to approval by a majority of the voters. (Pls.' Request for Admissions ¶ 86.) This amendment was approved by the voters on May 1, 1962, and proclaimed ratified as Amendment 202 on May 10, 1962. (*Id.*) Only three cities and eight counties actually passed additional ad valorem taxes in 1962. (*Id.* ¶ 78.) Many more proposals were turned down. (*Id.*)

48. Meanwhile, throughout the 1950s and 1960s, it was becoming more and more certain that the courts would order reform of the crazy quilt system of property assessments around the state. (Thornton Dep. at 167.) Public utilities, because their property was assessed at the state level, were having state and local millage rates applied to their property's fair market value based on substantially higher assessment ratios (although not the full sixty percent state law called for) than were being applied to others by county tax assessors. (*Id.* at 169.) "The highest assessment level in the state was 30 percent. And that was in Jefferson County. Everything else ... was below 30 percent. And it was ... in some counties vastly, grossly below 30 percent." (*Id.*) The Alabama Supreme Court ruled in favor of the utilities when they challenged their assessments in court. *State v. Ala. Power Co.*, 254 Ala. 327, 48 So.2d 445 (1950).

49. Until adoption of the first Lid Bill amendment in 1971, the Alabama Constitution required all taxable property within the State to be included in a single class for ad valorem tax purposes. (Pls.' Request for Admissions ¶ 90.)

50. In 1957, the Alabama Education Commission rejected proposals to reform the property tax system and instead recommended a sales tax increase. This tax had long been supported by the Black Belt planters and urban industrialists as a way to ensure that non-property owners of Alabama paid their "fair share" of the tax burden. (Pls.' Request for Admissions ¶ 92.) In July 1959, Superintendent of Schools Austin Meadows issued a statement that warned: "The enemies of public schools and those who did not want to pay the school bills timed sharp and deep threats at public schools with the fear of integration to choke education in this state." (*Id.* ¶ 93.) Their attacks, according to Meadows, were not direct: "They oppose the means for providing education." *Id.*

51. The most powerful lobbying organizations in Alabama were the Alabama Chamber of Commerce, the Associated Industries of Alabama and the Alabama Farm Bureau Federation. (Pls.' Request for Admissions ¶ 94.) In 1959, exercising his statutory authority as Revenue Commissioner, Harry Haden issued a revenue regulation that required all property to be assessed at thirty percent of its fair market value. (*Id.* ¶ 95.) Legislators introduced bills that would strip the Revenue Commissioner of his powers. (*Id.*) In the end, Governor Patterson compromised by agreeing to give up Haden's equalization program in return for abandonment of the bills stripping the Revenue Commissioner of his authority. (*Id.* ¶ 96.)

52. The reapportionment controversies of 1962 broke down along urban-rural lines. *See generally Sims v. Frink*, 208 F.Supp. 431 (M.D.Ala.1962) (3-judge court), *aff'd sub nom. Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Nevertheless, the Black Belt agricultural interests and Birmingham industry still shared opposition to increased taxes. (Pls.' Request for Admissions ¶ 97.) Whites were concerned about losing control of their local governments, first, because blacks were gaining the balance of power in local elections by the mid-1950s in Montgomery and Tuskegee, and because blacks were gaining voting majorities by 1966 in Macon, Greene, and potentially a dozen more counties. (*Id.*

¶ 98.) For Black Belt landowners the connection between legislative reapportionment, the rise of the black vote, and fear of increased property taxes was particularly strong. (*Id.* ¶ 99.)

53. An example of this fear is Sam Engelhardt. Sam Englehardt was a state senator from Shorter, Macon County, Alabama, during the 1950s. (May 4, 2004, Tr. at 88–90.) During his political career, which extended into the 1960s, Senator Englehardt was also head of the White Citizens Council of Alabama, Chairman of the Alabama Democratic Party, State Highway Director, the legislator who proposed splitting Macon County, and the legislator who procured the famous Tuskegee gerrymander that was struck down in *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). (*Id.*) *See generally Dillard v. Crenshaw County*, 640 F.Supp. 1347, 1357 (M.D.Ala.1986) (discussing Engelhardt's role in Alabama's efforts to suppress black voting strength). Behind Senator Engelhardt's concern about black voting lay economic self-interest. Pls.' Request for Admissions ¶ 100. "Everybody has an angle when they get in [politics]," he said. "I was worried ... about the tax assessor ... because of all our holdings," he said, referring to the many thousands of acres of rich agricultural land the Engelhardt family owned in Shorter. (*Id.*) "That was my angle—to protect ourselves. Not only me, but my family. My aunts, uncles, and cousins owned land." (*Id.*) He based his concern about who was tax assessor on a racist assumption. (*Id.*) "If you have a nigger tax assessor," he rhetorically asked a journalist in 1956, "what would he do to you?" (*Id.*) The obvious answer, to Engelhardt, was that a black tax assessor would try to exploit white landowners. (*Id.*)

54. Engelhardt's attitudes about the threat to whites' property taxes posed by rising black political influence was typical of whites' attitudes throughout Alabama, particularly in the Black Belt. May 4, 2004, Tr. at 90.

Mr. Engelhardt I think was fully representative of the attitude of the folks who had long been in power, who had dominated the Black Belt counties, who had dominated the legislature in Alabama since Reconstruction, and for that matter who had their way about all the crucial issues in politics in Alabama since Reconstruction....

From their historical experience in Alabama, the most basic and first public policy effort that blacks had made during Reconstruction once they got the franchise initially was to enact property taxes that were much higher on land than had ever existed in Alabama up to that time. So, there's that historical experience that informed for subsequent generations of Alabamians that ... what a black voter, an empowered black citizen, would want to do, ... was to put taxes on white landowners.

(Norrell, May 4, 2004, Tr. at 91.)

55. During his first term as governor, George Wallace, who grew up in Barbour County, made no attempt to achieve property tax reform. (Pls.' Request for Admissions ¶ 102.) Throughout the 1960s and 70s, his hallmark opposition to school desegregation, his rural county constituent base, and the growth of private school options for white flight all contributed to the defeat of property tax reform. (*Id.*) In January 1964, Governor Wallace toured the newly opened Macon Academy. (*Id.* ¶ 103.) He praised

the private school and a month later called for public contributions to support white students boycotting Macon County's integrated schools. (*Id.*) Wallace's office maintained a file of letters from individuals giving money to the Macon Academy; one contribution was for twenty thousand dollars. (*Id.* ¶ 104.) A woman wrote to Wallace telling him that she would like to donate seven thousand dollars toward the improvement of education in Alabama and asked him to suggest where it should go. (*Id.*) He replied: "You may wish to contact the Macon Academy in Tuskegee, Alabama. The academy is a private school which was set up by individuals in Macon County who were not satisfied with the Federal Court order which did away with their rights to run the schools in that County as they saw fit." (*Id.*) There were many more letters like this in the one-and-a-half-inch-thick file. (*Id.*) Governor Wallace also supported white academies in other counties, and he pressured cabinet members to contribute to them. (*Id.* ¶ 105.) His office maintained lists of contributors. (*Id.*)

56. The principal opposition to reform of the property assessment system came from the Alabama Farm Bureau and forestry interests, which began lobbying for a classification system that would protect them from high assessment ratios. (Thornton Dep. at 170–71.) The taxation system of Alabama was supported by the alliance of Black Belt planters and urban industrialists, who continued to protect their private financial interests. (Pls.' Request for Admissions ¶ 91.)

57. When Lurleen Wallace succeeded her husband as Governor, Wallace's Black Belt supporters began to push to protect their property against increased taxes. (Pls.' Request for Admissions ¶¶ 106–07.) An effort to amend the 1901 Constitution to eliminate, once and for all, the century-old requirement of equal assessment and taxation rates, failed. (*Id.*)

58. In 1967, the legislature's Joint Committee on Ad Valorem Taxation issued a report that recommended the establishment of a statewide reassessment program, with professional qualifications required of county boards of equalization and lowering of the fictional sixty percent assessment maximum rate to a more realistic thirty percent. (Pls.' Request for Admissions ¶ 109.) Timberland would be assessed at its bare-land value. Growing timber would be exempt from property taxation, as would be other crops, but a severance tax would be levied on timber when marketed. (*Id.*) There would be no exemptions for machinery or other personal property (for example, autos, boats, airplanes, trucks, and trailers) used in a business. (*Id.*)

59. A report issued by a four-person minority of the interim committee recommended different percentage levels for the assessment of the various classes of property. (Pls.' Request for Admissions ¶ 110.) In particular, it recommended that rural property be assessed at lower levels than other kinds. (*Id.*) Bills reflecting this Farm Bureau Federation perspective were introduced in the Senate on Tuesday in the third week of July 1967, and assigned to the Finance and Taxation Committee. (*Id.*)

60. On August 8, 1967, the Farm Bureau bill was defeated in the House because it failed to win the three-fifths vote required of a constitutional amendment. (Pls.' Request for Admissions ¶ 111.) On August 10, 1967,

the House voted to reconsider the Farm Bureau bill, and the motion passed by a vote of seventy-two to sixteen. (*Id.* ¶ 112.) In the bill that finally passed the House, personal property was assessed at twenty percent, business property at twenty-five percent, residential property at twenty percent, and utilities at forty percent. (*Id.*) Farm land was assessed at the lowest ratio of all, fifteen percent. (*Id.*)

61. In 1967, the legislature ultimately passed a thirty percent cap on property tax assessments plus a number of exemptions that changed virtually nothing. (Pls.' Request for Admissions ¶ 114.) This outcome represented a victory for the rural counties despite the fact that the legislation did not contain property categories. (*Id.*)

62. Although the legislation did not propose to amend the 1901 Constitution to establish the separate property tax classes the Farm Bureau forces had wanted, it did formally repeal the sixty percent uniform assessment ratio, capping all property assessments at thirty percent of fair market value and granting state and local tax officials wide discretion in the setting of ad valorem assessment rates. (Pls.' Request for Admissions ¶ 117.) This assured that local officials would not increase taxes significantly. (*Id.*)

63. In 1968, an agriculture study commission, concerned that farmers might be asked to shoulder property taxes at rates comparable to what others were paying, proposed to change Alabama law to provide that assessments be based on current use and not the market value of property. (Pls.' Request for Admissions ¶ 119.) The governor at that time, Albert Brewer, focused on a county's tax effort and

ability to pay measured by the county's mean per-capita income compared to the mean per-capita income of the state. (*Id.* ¶ 120.) Thus, a relatively poor county making a relatively strong effort to support its schools would be rewarded with extra state funds; likewise, a relatively wealthy county doing a below-average job of supporting its schools would be denied some funds even if it raised more taxes than the poorer county. (*Id.*) The plan gave counties two years to bring their tax systems up to the state standard and gave county commissions the power to propose tax increases to their electorates. (*Id.*)

64. The urban bloc began a filibuster in the Senate on April 15, 1969. (Pls.' Request for Admissions ¶ 121.) Its proximate target was the bill to create the Alabama Commission on Higher Education ("ACHE"), but it could have been any bill. (*Id.*) The urban bloc had tried to wring concessions on property tax equalization out of Governor Brewer in the House and wanted funding distribution formulas closer to a per student basis. (*Id.*) Governor Brewer favored property tax equalization, but he feared that it would not get through the special session and that it would probably tangle up his other bills as well. (*Id.*) The Achilles' heel in the urban bloc's Senate filibuster, however, was that urban legislators favored much of Governor Brewer's education program. (*Id.* ¶ 122.) They knew or suspected that in 1970 he would be competing for reelection against George Wallace, who would not support property tax equalization. (*Id.*) To embarrass Brewer too much with their filibuster would consequently be counterproductive. (*Id.*) Notwithstanding doubts about the usefulness of Gover-

nor Brewer's new minimum standard property tax bill with its penalty provision, urban legislators supported it, and in 1969 it passed the legislature and was signed into law. (*Id.* ¶ 123.)

65. By 1971, two years following enactment, when the penalty provision of the law was scheduled for implementation, few underassessed counties had acted to bring themselves up to the state norm. (Pls.' Request for Admissions ¶ 124.) Some counties had tried but failed to win the taxpayers' approval. (*Id.*) In all, thirty-nine counties stood to lose funds. (*Id.*)

66. In 1971, a three-judge federal court in *Weissinger v. Boswell*, 330 F.Supp. 615 (M.D.Ala.1971) (3–judge court), held that the 1967 statute violated both the federal and state constitutions. (Pls.' Request for Admissions ¶ 125.) Specifically, the *Weissinger* court made the following findings:

In 1969 the State Department of Revenue commenced an assessment-sales ratio study to determine the ad valorem tax assessment ratio of fair and reasonable market value of real property in each county in the state and to determine the statewide median ratio. The results of this study, the reliability of which is not in issue, reveal that the median ratios for the individual counties in the State of Alabama range from lows of 6.7 and 7 percent of fair market value in rural Hale and Washington Counties to highs of 23.1 and 26.8 percent of fair market value in urban Madison and Jefferson Counties. The study further reveals that the median assessment ratio for the state was approximately 16.9 percent of fair market value.

*Weissinger*, 330 F.Supp. at 621 (footnotes omitted). The *Weissinger* court further ruled that because the 1967 law

had been declared unconstitutional, the thirty percent of market value assessment ratio as provided in that law could no longer be enforced; thus, the court restored the sixty percent ratio set out in the 1935 statute. *Id.* at 625. The court gave the State one year to bring its property tax laws into compliance with the court's equalization mandate. *Id.* Subsequently, because of the difficulties in conducting a statewide reassessment of property, the court in an unreported order extended to June 29, 1979, the deadline for applying equal assessment ratios for all like property throughout the state. (Pls.' Request for Admissions ¶ 126.)

67. In the meantime, however, George Wallace had defeated Albert Brewer in the 1970 gubernatorial election. (Pls.' Request for Admissions ¶ 127.) Even though only one black legislator, Fred Gray, had been elected in 1970, the three-judge federal court in Montgomery clearly was headed toward new decrees that would more nearly equalize the populations in House and Senate districts and empower additional black voter majorities. (*Id.* ¶ 128.) Property owners were concerned about the prospect of increased property taxes. (*Id.*) Legislative power was already passing to urban areas, where there was much stronger support for property taxes, and where rates were already higher than the rates in rural areas. (*Id.*) Blacks in the cities were better organized politically and were more capable of making their influence felt in the Legislature. (*Id.*) According to Dr. Norrell, "there's no question but that the Sam Engelhardts and the Walter Givhans and the George Wallaces of the world knew exactly that *Reynolds v. Sim[]s* and the subsequent reapportionment decisions that

followed from that were going to change the nature of the Alabama Legislature to bring African–American representation into that body." (May 4, 2004, Tr. at 108.)

68. Indeed, when he addressed the Regular Session of the Legislature on May 4, 1971, George Wallace expressly linked opposition to tax increases with opposition to federal intervention in affairs of the state:

Education is still the primary function of State Government, and I believe under existing revenues we can have a teacher salary increase, a better free textbook program, a better retirement program which has already been introduced.

Other legislation along this line will be introduced, because I am proud of the fact that during the time I was Governor the first time, a breakthrough in education came. The largest increases at any time because of our interest. But I am frank to tell you, and to tell educators, that the people of Alabama are simply turned off on education and some educators because of what the Federal Courts and HEW have done to their children from Huntsville to Mobile. Every one of you know I am telling you the truth when I tell you that.

(Pls.' Request for Admissions ¶ 129.) Additionally, white hostility toward court-ordered busing was at a peak in 1971, the year of *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), and *Davis v. Board of School Comm'rs of Mobile County,* 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971). (May 4, 2004, Tr. at 109–10.)

69. The *Weissinger* decision came down on June 29, 1971, and the Regular Session adjourned without passing either a General Fund or an Education Fund budget. (Pls.' Request for Admissions ¶ 130.) The dissension caused by the issues of legislative redistricting and court-ordered ad valorem tax reform made constructive legislation during the closing days and hours impossible, thus necessitating additional special sessions. (*Id.*) An education budget finally was adopted in a second special session in November 1971. (*Id.* ¶ 131.) A third special session was called to respond to *Weissinger.* (*Id.*) A law was enacted requiring local county authorities to reappraise all property or have it done for them by the State Department of Revenue. Act No. 160, 1971 Ala. Acts (Third Special Sess.). (Pls.' Request for Admissions ¶ 131.)

70. During that third special session of 1971, the Legislature also passed a bill proposing what became Amendment 325 of the 1901 Constitution. (Pls.' Request for Admissions ¶ 132.) This first Lid Bill was ratified by the voters on June 8, 1972. (*Id.*) Amendment 325 established for the first time separate classes of property for taxation purposes. (*Id.* ¶ 133.)

71. Governor George Wallace expressly linked the federal court's *Weissinger* order to federally court-ordered reapportionment of the Legislature and busing for school desegregation:

Wallace, in the Fall, August, of '71, threatens to close some schools. This gave him a very powerful issue looking toward the 1972 presidential election, and in that context, when he called for a series of special sessions of the legislature to deal with, he said, reapportionment—they had to act on reapportionment at this exact same time—he called for an anti-busing piece of legislation, which was passed and of course was declared unconsti-

tutional. The same night he called for that, he calls for a lid bill to cap property taxes in Alabama in the context of burgeoning private schools and massive exit from public schools in Alabama because of busing. He says, "we're going—we're going to cap property taxes, make sure that no federal judge"—now, he's talking ... about his old colleague, college mate, law school mate, Frank Johnson, the man who ... during Lee versus Macon, the ... original desegregation case throughout Alabama, he'd said ... Judge Johnson, needed a barbed wire enema. Well, you know, that kind of baiting of federal judges, ... is applied then to Pointer in Birmingham, to Pittman in Mobile. It's clearly the kind of racial code messages that Wallace has perfected already at this point he applies in Alabama in the fall of 1971 in calling for a shoring up of the caps on property tax which became the Lid Bill.

(May 4, 2004, Tr. at 110.) Wallace "embraced the Alabama Farm Bureau Federation's plan for a graded system. He said he didn't want to get into the details. He just wanted to remind everybody that they shouldn't have to pay any more taxes. This was ... a mandate of a federal judge or three federal judges, and people shouldn't have to do it in the climate where ... these same judges are making their children ride hundreds of miles a day on buses." (*Id.* at 115.)

72. The Chairman of the Senate Finance and Taxation Committee when the Amendment 325 bill passed was Walter Givhan of Dallas County, who was at that time head of the White Citizens Council. (May 4, 2004, Tr. at 102.) The result of Amendment 325 was to legalize the de facto classifications in effect when *Weissinger* was filed in 1969. (Pls.' Request for Admissions ¶ 134.) The reappraisal pe-

riod was stretched over seven years. (*Id.*) The "local option" Amendment 325 authorized counties to vary their assessment ratios and tax rates in a manner carefully constrained to maintaining the status quo. (*Id.* ¶ 135.) Bill Sellers, political commentator for the Mobile Press Register, explained: Various technical, legal or constitutional reasons were voiced for the opposition to local option, but some observers feel that the main objection stems from the fact that in a growing number of Alabama counties, blacks are gaining control of county governments. Senators representing some of these counties are considered fearful that the black political leaders, who also enjoy voting majorities, will exercise local options and set property taxes at the highest rates possible in order to raise additional funds for their governmental operations. These taxes will be paid by the property owners, considered by the senators to be white owners of large farms and corporate interests with large timberland holdings

(*Id.* (quoting *Mobile Press Register,* Dec. 12, 1971).)

73. The convergence in one year, 1971, of four federal mandates requiring re-enfranchisement of African–Americans, reapportionment of the Alabama Legislature, fair reassessment of all property subject to taxes, and school desegregation, had thus created a "perfect storm" that threatened the historical constitutional scheme whites had designed to shield their property from taxation by officials elected by black voters for the benefit of black students. (May 4, 2004, Tr. at 116.)

74. The provision in Amendment 325 giving the Legislature authority to vary

the assessment ratios from county to county, and the laws enacted pursuant to it, Ala.Code § 40–8–1 (1975), were challenged on non-racial equal protection grounds in a separate federal lawsuit filed in Mobile. (Pls.' Request for Admissions ¶ 136.) On April 21, 1978, Judge Hand ruled that the statutory variations of assessment ratios among the counties violated the Equal Protection Clause of the Fourteenth Amendment. *McCarthy v. Jones,* 449 F.Supp. 480, 484 (S.D.Ala. 1978). Judge Hand declined, however, to strike down Amendment 325 in its entirety on the theory that it was possible that the Legislature could vary the assessment ratios among counties in a rational way that met equal protection standards. *Id.* at 485.

75. In the years between passage of Amendment 325 in 1971 and the *Weissinger* court's 1979 deadline, Governor Wallace made an effort to break the statutory earmarking of the Special Education Trust Fund. May 4, 2004, Tr. at 118–20. He was opposed principally by the Alabama Education Association ("AEA"), which had merged with the all-black Alabama State Teachers' Association ("ASTA") and was viewed as a liberal, pro-black lobby. AEA was also one of the opponents of the Lid Bill. (*Id.*) As the statewide reassessment program drew to its conclusion and property assessments were going up, again, the Farm Bureau and industrial interests succeeded in getting the Legislature further to amend the state constitution to preserve the status quo of historically low property taxes. (*Id.* at 120.) In 1978, Governor George Wallace appealed to the legislature to approve new legislation designed to circumvent the effect of *Weissinger v. Boswell* by providing a set of ad valorem tax laws which would produce comparable revenues, both state and local, in the same amounts as those produced before the court mandate. (Pls.' Request for Admissions ¶ 137.) One piece of this package was Amendment 373, an amended Lid Bill, which was adopted in the Second Special Session and ratified in the November 7, 1978, general election by a vote of 313,577 to 205,782. (*Id.* ¶ 138.) Only five counties, Jefferson, Shelby, Walker, Blount, and Wilcox, voted against the measure. (*Id.*)

### g. Summary

76. The 1971 Amendment 325, which established the first classification system for property taxes in Alabama history, and the 1978 Amendment 373, which modified the assessment ratios and added a current use provision for farm and timber land, were the products of a series of contemporaneous events that brought to an end the ability of Black Belt whites to control the Legislature and to block increases in local property taxes. All of the those events revolved around the rise of black political power: (1) school desegregation, which undermined support for public schools; (2) court challenges to the widespread under-assessment of property for tax purposes, culminating in the 1971 federal court decree in *Weissinger v. Boswell,* which required uniform property assessments statewide; (3) corresponding pushes by the Farm Bureau and forestry interests to obtain additional constitutional protection from legislative or local tax initiatives; (4) legislative reapportionment resulting in an increase in the number of black legislators, which created a corresponding

growing concern on the part of white property owners about their property taxes being raised; and (5) passage of the 1965 Voting Rights Act, re-enfranchisement of blacks, and corresponding litigation challenging racially discriminatory election structures. (Thornton Dep. at 160–80.)

77. There is a direct line of continuity between the property tax provisions of the 1875 Constitution, the 1901 Constitution, and the amendments up to 1978. (Thornton Dep. at 175–81.) "[T]he fact is, that this is a set of assumptions and a set of institutional relationships and a set of social relationships that ... is created by historical events, that is historically created and ... interrelated so that the events feed onto each other and it makes a single understandable whole." (*Id.* at 174.) The historical fears of white property owners, particularly those residing in the Black Belt, that black majorities in their counties would eventually become fully enfranchised and raise their property taxes motivated the property tax provisions in the 1901 Constitution and the amendments to it in 1971 and 1978. (*Id.* at 178–80; *accord,* Norrell, May 4, 2004, Tr. at 95 ("The limits are always associated with white supremacist intent, and that occurs in 1875, strongly reinforced in 1901, and essentially uninterrupted, unbroken, ... as main public policy commitments of the state through the 1970's.").)

78. Dr. Norrell agreed with another point Dr. Thornton made in his deposition: [A]ll tax policy made or revised in the 20th century has effectively been made to conform with the commitments of taxation capped by constitutional mandate, reinforced by limits on local control, local authority to tax, and that of course was the result of

fears, especially among Black Belt counties, that in the future some re-enfranchised black electorate would raise property taxes, the very fear that Sam Engelhardt acted on starting about 1950. And Thornton then takes us into the more modern period and effectively says, you know, these themes continue right through the important policy decisions made with regard to property taxes in 1971 and shored up to an extent in 1978.

(May 4, 2004, Tr. at 95.) Dr. Norrell summarized his testimony as follows:

[S]tate policies about property taxes were formulated in the context of the racially charged circumstance of Reconstruction and the immediate post Reconstruction years. Those property tax policies were created to maintain the lowest possible taxation because property taxation is associated with funding for education for black children, and ... that's anathema to this very conservative white supremacist group that gains dominance in 1875, that reinforces and sort of strengthens its structure in the 1901 [constitution], the time at which the vast majority of black voters are taken out of the polity in Alabama, and that those policies of minimal property taxes, of white supremacist control of local government, of minimal support for black education in Alabama are effectively uninterrupted even through the various anxieties and concerns that white supremacists had in Alabama as a result of the coming ... civil rights movement and the reality of the civil rights movement. And even after we think of the modern civil rights movement having succeeded with the Civil Rights Act of '64, the Voting Rights Act of '65, that those same forces are able to further reinforce the historic commit-

ment to minimal property taxation, minimal support for education now because of course it ... means education, desegregated or integrated racial education in Alabama. So, ... it's a story for me and for Thornton of powerful continuities established in 1875 or thereabouts and continuing effectively uninterrupted in the making of policy through 1978, and ... folks in Alabama still live very much under policies that were effectively created in 1875 and continuously reinforced up through the years.

Q. And the 1971 and 1978 lid bills reinforced those same policies?

A. That's right.

(May 4, 2004, Tr. at 120–22.) Indeed, Black Belt and urban industrial interests successfully used the argument that it is unfair for white property owners to pay for the education of blacks to produce all the state constitutional barriers to property taxes from 1875 to the present, including the 1971 and 1978 Lid Bill amendments. (Thornton Dep. at 211–12.)

## B. Continuing Effects of Discrimination

### 1. Continuing Effect on Tax Policy

79. The Plaintiffs introduced the testimony of Professor Susan Pace Hamill, Professor of Law at the University of Alabama, who has conducted an in-depth study of Alabama's property tax system. *See generally* Susan Pace Hamill, *Constitutional Reform in Alabama: A Necessary Step Toward Achieving a Fair and Efficient Tax Structure*, 33 Cumb. L.Rev. 437 (2002–03) (the "Cumberland Law Review article"); Susan Pace Hamill, *An Argument for Tax Reform Based on Judeo–Christian Ethics*, 54 Ala. L.Rev. 1 (2002) ("the Alabama Law Review article").

80. In her Alabama Law Review article Professor Hamill empirically documented how Alabama's income, sales, and property tax laws unfairly burden poor and lower-income Alabamians. (May 4, 2004, Tr. at 10.) According to Professor Hamill, Alabama's state and local tax injustice takes two forms: regressive income and sales tax laws overtax poor and lower-income citizens, while grossly inadequate revenues supporting education deny those citizens opportunities to improve their condition. (*Id.*) Professor Hamill's research demonstrates that the property tax provisions are the primary force driving both injustices. Alabama Law Review Article at 11–20.

81. Alabama's per capita property tax and revenues are the lowest of all fifty states-the State collects only $250 in property taxes per person. Alabama Law Review Article at 20 n. 50. Prof. Hamill writes:

The nationwide average of property tax collections per capita imposed at the state, county, municipal, and school district levels, exceeded Alabama's per capita property tax collections by more than three times. The top three ranked states in the nation collected over six times more property tax per person than Alabama, and among the Southeastern states, Florida collected almost four times, while Georgia collected almost three times more property taxes per person than Alabama. Mississippi, North Carolina, South Carolina, Tennessee, and Kentucky each collected around twice as much property tax per person as Alabama.

*Id.* at 20–21 (footnotes omitted).

82. Moreover, Alabama collects approximately fifty percent less state and

federal revenues from all sources than does the average state in the United States, with property taxes making up as little as five percent of Alabama's revenue sources. Alabama Law Review article at 10 n. 9, 22–23. More than half of Alabama's tax revenue is collected through sales tax, which reaches as high as eleven percent in some areas of the state. *Id.* at 18 n. 43, 19–20, 84–85. Professor Hamill testified that in addition to imposing the harshest burdens on the poorest Alabamians, Alabama's over-reliance on sales taxes supports the conclusion that inadequate property taxes cause Alabama's inadequate revenues. (May 4, 2004, Tr. at 14–15, 32.) Specifically, because most rural and low-income counties have small commercial sales bases, sales taxes will never raise adequate revenues to meet minimum needs, including educational needs. (*Id.*) According to Professor Hamill, the state's low revenues demonstrate that a greater reliance on sales taxes cannot compensate for disproportionately low property taxes. (*Id.*)

83. Professor Hamill also identified the two principal mechanisms in the 1901 Constitution that restrict property taxes: (1) the constitutional cap on millage rates at the state and local levels, and (2) the Lid Bill (Amendments 325 and 373) that imposes absolute dollar amount limits on the amount of tax as a percentage of fair market value, entrenches low assessment ratios for separate classifications of property, and mandates a low current use valuation for timber and farm land. (May 4, 2004, Tr. at 16–18.) In particular, the Lid Bill, by constitutionally keeping the property tax base at a mere fraction of the property's value, guarantees that no level of millage rates will produce minimally adequate property taxes. (*Id.* at 20–22.)

84. As way of example, property tax revenues from timber lands, which constitute seventy-one percent of Alabama's geographic land mass, average less than $1.00 per acre and account for only two percent of all property tax revenue. (Pls.' Ex. 56; May 4, 2004, Tr. at 22–25.) Further, an increase in millage rates alone would not increase the proportion of the property tax revenue derived from timber. (May 4, 2004, Tr. at 27.) Thus, even with greater millage rates, timber land would still provide merely two percent of revenue derived from property tax.

85. The low assessment ratios are also evident when comparing fair market and current use value of property types with the effective assessed value. For instance, the state net assessed value of Class III property, which includes timber, farms, and personal residences, is just under $10 billion, whereas the fair market and current use value of that same property exceeds $120 billion. (Pls.' Ex. 111.) In other words, the state net assessed value of Class III property is 8.33 percent of its fair market and current use value. (*Id.*) Similarly, the state net assessed value of Class I property, utility property, is twenty percent of its fair market value; for Class II property, business property, the state net assessed value is 18.11 percent of its fair market value; and for Class IV property, motor vehicles, the state net assessed value is approximately thirteen percent of its fair market value. (*Id.*) If assessment ratios for the foregoing classes of property were set at thirty percent, approximately an additional $1.68 billion would be generated. (May 4, 2004, Tr. at 159.) Likewise,

if assessment ratios were set at a 40/30 percent hybrid system, an additional $2.29 billion would be generated. (*Id.*) Under an assessment ratio of sixty percent, as was threatened in *Weissenger,* an additional $5.09 billion would be raised. (*Id.*) Moreover, those additional revenues would be higher if agricultural and timber land were taxed at some amount other than "current use." (*Id.*)

86. Dr. Daniel J. Sullivan, economic expert for Plaintiffs, concluded that the implications of Alabama's unique constitutional property tax structure are: (a) the combination of limits on assessment ratios and millage rates makes the capacity of property tax much lower in Alabama than in any other state; (b) the decision-making process is much more cumbersome in Alabama than it is in other states, making change efforts far more difficult; (c) because virtually all changes people seek regarding the property tax are efforts to increase it, the cumbersome process in Alabama results in Alabama continuing to fall farther behind other states; (d) the decision-making process also contributes to Alabama's tax system being one of the least efficient and least equitable in the nation; and (e) the greater difficulty in making changes, relative to other states, has the effect of preserving the past and preserving any inequities that result from social values and public priorities that were in place at the time the structure was established. (May 5, 2004, Tr. at 79–81.)

### 2. Effect on Funding for Public K–12 and Higher Education

87. The effect of low property tax revenues has had a crippling effect on poor, majority black school districts. (May 4, 2004, Tr. at 27–30.)

88. In rural areas of the state, most local school districts simply do not have a critical mass of valuable commercial property and residential homes-the two types of property shouldering eighty-five percent of the property taxes-to raise adequate funds for public education. (May 4, 2004, Tr. at 31–32.) Moreover, in areas where the significant source of wealth is timber, the property tax structure bars taxation above ten percent of the current use value of such areas; consequently, that property does not provide much property tax revenue. (*Id.;* Pls.' Ex. 57.)

89. Indeed, even areas boasting valuable commercial and residential property have difficulty in raising adequate revenue because of the Lid Bill's low assessment ratios for all property classifications. (May 4, 2004, Tr. at 32–34.)

90. Dr. Ed Richardson, Interim President of Auburn University and former Alabama State Superintendent of Education, testified at his deposition regarding the effect of the lack of funding on K–12 and higher education. Dr. Richardson testified that the tuition at Auburn University will likely increase by nine percent next year, the tuition at JSU will likely increase fourteen percent next year and the tuition at ASU will likely increase twenty percent next year. (Dep. of Ed. Richardson at 21, 45–46.) Dr. Richardson also testified that if tuition at Alabama's state public universities continues to increase at a rate of eight to twelve percent per year, families with household incomes less than $20,000, as well as those with incomes of $40,000 to $50,000 per year, will be unable to afford college. (*Id.* at 13–14.)

91. Dr. Richardson also testified that the State Department of Education conducted studies indicating a strong correlation among black students, poverty, and low achievement scores. (Richardson Dep. at 18–20.) Those studies also indicated that a high correlation exists among large black enrollments, high percentages of students eligible for subsidized lunches, and high schools placed on academic watch by the State Department of Education. (*Id.* at 19–21.) Indeed, of the forty-four Alabama high schools placed on academic watch[2] in 2002, most had both black student majorities and above average percentages of students participating in the reduced lunch program. (*Id.* at 21.) Additionally, although forty percent of the students enrolled in Alabama public school were non-white, only thirty-five percent of high school graduates were non-white. (*Id.* at 33.)

92. Lack of state funding has also adversely impacted funding for financial aid, which disproportionately burdens poor, black families. Dr. Richardson testified at his deposition that because poor families do not have the ability to assume large indebtedness, those families are increasingly unable to attend institutions of higher education as financial aid remains stagnant while student indebtedness rises. (Richardson Dep. at 28–31.)

93. Additionally, financial aid for students at Alabama's colleges comes almost exclusively from federal Pell grants,[3] which do not cover living expenses; consequently, low income students who receive federal financial assistance must incur substantial debt or find work. (Richardson Dep. at 28–31.)[4]

**2.** High schools are placed on academic watch when less than eighty percent of graduates pass the exit exam administered by the State Department of Education. (Richardson Dep. at 15–16.)

**3.** Pell grants are entirely a need-based program and are the largest federal grant program. The only component of merit to Pell grants is that the student must have graduated from high school or have a GED, and once enrolled in college, the student must maintain satisfactory progress as defined by the institution, which is generally a minimum grade point average. (May 5, 2004, Tr. at 165.)

**4.** Dr. Carlos Clark, Director of Financial Aid at AAMU, testified that seventy-six percent of the 6,588 students at AAMU receive some sort of financial aid, which includes student loans, grants, scholarships, and work. (May 5, 2004 Tr. at 196.) Last year, as many as eighty-eight percent of AAMU students received financial aid. (*Id.* at 208.) This year, total student financial aid at AAMU came to $31 million, compared with $20 million in the 2000–01 school year. (*Id.* at 208.)

Dr. Clark also testified that tuition at AAMU rose 12.5% this year, and it has risen 120% since 1996, when it cost only $920 per semester. (May 5, 2004, Tr. at 209.) Financial aid has failed to offset the increasing tuition and fees. (*Id.* at 209–10.) For instance, AAMU received only $25,000 in state financial aid that it can distribute to its students this year, which it awarded to those students who had exceptional need, defined, according to federal methodology, as those students who had an estimated financial contribution, of zero. (May 5, 2004, Tr. at 196–97.) In total, some 100 students received approximately $200 apiece in state need-based financial aid. (*Id.*)

Federal assistance, in the form of grants, loans, and work-study programs, is limited as well. The maximum federal Pell grant that can be awarded is $2,025 per semester, and the average Pell grant for AAMU students this year was $1,000. (May 5, 2004, Tr. at 197–98.) Three kinds of student loans are available: federally subsidized loans, which are need-based, and unsubsidized student and parent-plus loans, which are credit-based. (*Id.* at 198–99.) There is a sliding scale for subsidized loans: freshmen can receive $2,625 per year; sophomores, $3,500; juniors and seniors can receive $5,500. (*Id.*)

94. In an effort to assist lower-income students, Auburn University has tapped into its institutional funds to provide merit-based scholarships to students who graduate from "at-risk" high schools. Due to the lack of state funding, Auburn University this year set aside two million dollars of institutional funds for one hundred merit-based scholarships, thirty-six of which are dedicated to students graduating from at-risk high schools. (Richardson Dep. at 38–40.) While this effort is commendable, the overall impact of those scholarships is relatively small-one hundred students out of the 25,-000 that attend Auburn university represents a minute percentage. (*Id.* at 39.) Additionally, smaller institutions whose tuition are increasing do not have the capability to provide similar scholarships. (*Id.* at 42.)

95. Dr. Richardson also testified that as a result of the lack of state funding, faculty salaries at Alabama's state universities are well below regional and national averages, and absent increased state appropriations, tuition must continue to rise to compete to attract high-quality faculty members. (Richardson Dep. at 46–47.)

96. Dr. Richardson also identified two aspects in which the underfunding of K–12 public schools in Alabama has a negative impact on access to higher education: (1) the lack of financial resources results in lower academic achievement in K–12 and less likelihood of success in higher education; and (2) the lack of financial resources prevents poor school systems from offering college preparatory curriculums. (Richardson Dep. at 51–54.) According to Dr. Richardson:

What we have found is that based on disaggregation of test scores, that the most critical variable in terms of success in school is poverty. In other words, higher poverty, less success. And what we have found are for students that are in schools that are not well funded, they do not have access to advanced classes that would be required to have a good chance of success at Jacksonville or Alabama State or Auburn. So all of those contribute to a high probability of lack of success.

. . .

What you have are schools that have good local funding would be able to offer advanced placement courses, foreign language courses, higher level math, and in many cases the classes would be smaller and offered on a regular basis. So those students then would be able to take four years of aggressive mathematics. As I previously mentioned, mathematics seems

---

AAMU received $461,000 this year from the federal government for campus-based work-study, and it gave $4,800 each to 108 students. (*Id.* at 199.)

AAMU this year also used approximately $4 million of its institutional funds for merit-based scholarships. (May 5, 2004, Tr. at 200.)

AAMU lost 475 students between the Fall and Spring semesters, half of whom gave financial difficulties as their reason for leaving school. (May 5, 2004, at Tr. at 206–07.) Some of these students transfer to a community college that is closer to home and that has substantially lower tuition. (*Id.*) Students who stop out or drop out of AAMU also adversely affect other students' ability to receive financial assistance because students who *drop out of AAMU usually default on their* student loans, and those defaults reduce the amount of federally subsidized loans AAMU is allowed to make in the future. (*Id.* at 211–12.) Moreover, once a student drops out of AAMU, it is unlikely that he or she will return-only about twenty percent of students who drop out of AAMU ever come back. (*Id.* at 212.)

to be the subject that creates most problems for students. So I would just say that the schools with less funding are less able to offer advanced courses that would be instrumental in a student's success in college.

(*Id.* at 52–54.)

97. In 2003, Alabama spent $5,908 per K–12 student, compared with a national average of $7,376 per student. (Richardson Dep. at 55–56; Pls.' Ex. 36 (Editorial, *Mixed Bag: There's a Reason Schools Struggle to Maintain,* al.com (January 12, 2004)).)

98. One illustration of the strained education budget is Alabama's funding for textbooks:

I think we have 128 school systems now, or 129 perhaps, but 80 of that number used its textbook monies to some degree to avoid layoffs. In fact, we have had several school systems, 20 some-odd if I remember correctly, that had not purchased textbooks in three years. Now, you have to keep in mind, what's the problem. Well, they have kept the textbooks they have for six years already, so you add three more years on top of that. So you have got textbooks you have been using for nine years. Obviously the condition is bad, pages missing, and in some cases dated, you know, like science and social studies. So that was a tremendous impact, had a tremendous impact, and it was reflective of school systems that had low local support as well.

(Richardson Dep. at 58–59; Pls.' Ex. 37 (Regan Loyola Connolly, *State BOE Closes Books on New Texts,* Montgomery Advertiser (September 12, 2003)).)

99. Additionally, the current underfunding of K–12 public schools has almost entirely eliminated state appropriations for textbooks and remedial programs for students who fail the high school exit exam. (Richardson Dep. at 59–60, 70.)

100. According to Dr. Richardson, by the 2004–05 school year the reserve funds of 100 of the 128 public school systems in Alabama will have been depleted. (Richardson Dep. at 71.)

101. According to a February 23, 2003, "report card" released by the Alabama Board of Education, a "tremendous gulf" exists among differing racial and socioeconomic groups in Alabama. (Richardson Dep. at 67; Pls.' Ex. 38 (Ken L. Spear, *Cash Woes Tax Schools,* Montgomery Advertiser (Feb. 28, 2003)).) The test scores of whites in Alabama's K–12 schools placed them in the 65th percentile nationwide, Hispanics were in the 46th percentile, and blacks in the 39th percentile. (Richardson Dep. at 67; Pls.' Ex. 38 (Ken L. Spear, *Cash Woes Tax Schools,* Montgomery Advertiser (Feb. 28, 2003)).) Likewise, students receiving a free or reduced-price lunch, a common indicator of poverty, ranked in the 40th percentile nationwide, while students who paid for their lunches scored in the 67th percentile. (Richardson Dep. at 75–76; Pls.' Ex. 38 (Ken L. Spear, *Cash Woes Tax Schools,* Montgomery Advertiser (Feb. 28, 2003)).)

102. Importantly, more than a third of Alabama's college freshmen are not prepared for college level classes, and the number is rising, even though high school graduation exam scores and some elementary scores are improving. Last school year, thirty-five percent of freshmen at the state's public colleges and universities were enrolled in remedial courses. (Richardson Dep. at 76–77; Pls.' Ex. 39 (Regan Loyola Connolly,

*Students Lack Readiness for College,* Montgomery Advertiser (Feb. 27, 2004)).) Dr. Richardson expressed concern about the high percentage of college freshman enrolled in remedial classes because "Alabama has the most rigorous requirement for high school graduates of any state in the nation. We require more math and science than any other state. And for us to have that level of remediation was just rather shocking to me." (Richardson Dep. at 77.) Poor school systems must also meet the State Department's minimum requirements, but, according to Dr. Richardson, basic problems cannot be overcome without adequate funding: "The problem is, is that you have, in many cases, difficulty securing teachers with advanced math certification or science in some of your poor and rural—

rural really drives that about as much as anything." (*Id.* at 77–78.)

103. During the past few years, Alabama's K–12 students had been making "tremendous progress" increasing their standardized test scores, but recent budget cuts have made that progress "unravel." (Richardson Dep. at 79–80.) For instance, in the past year, the average high school dropout rate for Alabama students was fourteen or fifteen percent, but for black students it was "around the 20 percent range." (*Id.* at 81.) [5]

104. In 2002, the State Department of Education, responding to the mandate of the state court Equity Funding Case to make a recommendation to the Legislature, performed an analysis that indicated an additional $1.6 billion annually is needed to provide "adequate" [6] K–12 education

---

5. The dropout rates are calculated by the Alabama State Department of Education by extrapolating the ninth grade attrition rate forward four years, which may result in an overestimation of students actually graduating. (Richardson Dep. at 84–89; Pls.' Ex. 41 (Vicki McClure, *State Dropout Data Misleading,* The Birmingham News (March 12, 2004)).)

6. Dr. Richardson explained the careful methodology the State Department used to calculate what would constitute adequate K–12 funding in Alabama:

> We made a two-year study on every single aspect of education's operation. All right. Just to give you a couple of examples.... We went in and we looked at utility bills for schools that we felt were adequately heated and cooled, and averaged those out. We looked at the laws on the books, what does it require for special education? We looked at how much it costs to transport students. That was required. We looked at even how much money teachers are having to spend beyond the supply money that they were allocated. We went out and looked at bills and invoices. It took us about two years. So we could tell you three years ago how

much it costs to meet existing state laws, and to meet existing costs in Alabama. We didn't compare ourselves to Tennessee or anything else, just what it costs in Alabama. Just to meet existing state laws and to meet the actual cost of operation.

(Richardson Dep. at 94–95.) Dr. Richardson additionally explained why the State Department's calculation should satisfy any reasonable legal or legislative definition of adequacy:

> We believed that in order to go to the legislature and say, what is adequacy? You know, everybody has a different definition, like dropout rate, it's adequate one place, it's not adequate somewhere else. So we felt like we would just look at the actual cost of what does it cost to maintain the building, what does it cost to sweep the floors, the whole thin[g], and then we would then go to the legislature because we felt like that's eventually where we were going to have to go. Or, if it was picked up by an appellate court, then they would say, all right, we agree that adequacy is required. How much does it cost in Alabama? And then we could offer those numbers to support our case.

(*Id.* at 96–97.)

in Alabama. (Richardson Dep. at 94–111.) As of 2004, Dr. Richardson estimates that figure is closer to $2 billion. (*Id.* at 111.)

105. Dr. Richardson concurs with the following opinions expressed by Dr. William Muse in a letter to the editor Dr. Muse wrote when he resigned as President of Auburn University and accepted a position at East Carolina University: (1) Alabama has been hampered by a tax structure that is both inequitable and inadequate; (2) the tax structure places a disproportionate burden on the poor through an over-reliance on sales taxes and does not produce sufficient revenues to fund education, both elementary and secondary and higher education, on levels comparable to that of other Southern states; (3) a critical and necessary step in the process will be rewriting the state's antiquated constitution, because so many of the obstacles to progress, particularly the tax structure, are written into the constitution; and (4) one of the most important changes needed in Alabama is a substantial increase in property taxes because in Alabama, the property tax revenue is so low the state has to pick up the bulk of the cost of the public schools from regressive sales and income taxes; moreover, inasmuch as higher education is funded from the same source as K–12, the monies available to higher education are substantially reduced. (Richardson Dep. at 105–11; Pls.' Ex. 46 (William V. Muse, *State Should Heed North Carolina's Example*, Montgomery Advertiser (Jul. 8, 2001)).)

106. Dr. Sullivan similarly testified that because the ETF funds both K–12 schools and public colleges and universities, the constitutional con-

straints on property taxes have required an increasing share of the ETF to be allocated to K–12 schools, so that less state funds are available to public colleges and universities. (May 5, 2004, Tr. at 83–84.) According to Dr. Sullivan, if higher education's share of the ETF had remained constant over the last ten years, public colleges and universities would have received nearly $200 million more than those institutions actually received. (Pls.' Ex. 71 (chart depicting amount, distribution, and change in ETF revenues from 1990–91 to 2002–03).) That decline is most significant in the years following 1995 when the State implemented a new foundation program for K–12:

In terms of the specific issues related to the impact of the property tax and the relationship between K–12 funding and higher ed. funding, that relationship got a lot tighter after the foundation program was passed in '95, and so that ... starting 95–96 and then coming forward, that's where you start to see this sort of steady downward trend. And I would call ... to the court's attention [that] we already have a difference which amounts to as much as 200 million dollars between what would have been generated by the share a few years ago and what would be generated by it today .... [T]he trend is fairly steadily in the downward direction, and ... so one might anticipate that, absent any change, the higher ed. share could continue to decline.

(May 5, 2004, Tr. at 85–86.)

107. Dr. Sullivan identified that an important consequence of the reduction in the share of ETF revenue appropriated for higher education

has been that the gap between what the State appropriates and what ACHE defines as the "need" for the senior institutions, based on the median funding of the SREB [7] region, continues to widen. (May 5, 2004, Tr. at 86–88.) Since this case was tried in 1990, Alabama's state appropriations to senior institutions have declined from 84.1% of the ACHE regional standard to 55.8% of the ACHE regional standard. (*Id.* at 88; Pls.' Ex. 72 (chart demonstrating relationship between ETF appropriation for senior institutions and need, as measured by the ACHE standard).) In real dollars, these percentages represent a difference of over $650 million between Alabama's state appropriations and the regional standard of need and $400 million less than the 84% level of need that was being met during the 1990 trial. (May 5, 2004, Tr. at 89.) Moreover, "these data understate the magnitude of that drop because beginning in 95–96 the appropriation includes the retirement benefits that weren't in there in the early years that were separately appropriated. So that we've got some amount of money, somewhere perhaps between 50 and 100 million dollars, that's now imbedded into that—this higher ed. appropriation that wasn't there in the earlier years." (*Id.* at 88.)

108. Dr. Sullivan testified that senior institutions having to cope with budgets that represent a smaller fraction of their need have been adversely impacted in two ways: (1) the institutions have been unable to increase salaries as fast as institutions in other states and thus have fallen further behind their SREB counterparts and the United States as a whole (May 5, 2004, Tr. at 89–90); Pls.' Ex. 74(chart indicating median household in SREB states); and (2) the institutions have been forced to dramatically increase in tuition (May 5, 2004, Tr. at 91).

109. Although the dramatic increase in tuition is certainly not unique to Alabama, the results of the tuition increase are more burdensome in the State because (1) there is not a corresponding increase in need-based scholarship funding to ensure continued access for students from lower income households, and (2) the percent of students in Alabama who would be eligible for such aid (using federal guidelines) is well above average. (May 5, 2004, Tr. at 91–99; Pls.' Exs. 74, 76 (chart comparing need-based financial aid from state sources for students at public institutions) & 77 (chart indicating Pell grant funding in United States, SREB States, and Alabama from 1990–91 to 2000–01).) Those circumstances place considerably more of the burden of increased tuition on low-income students. (May 5, 2004, Tr. at 92.) That is, compared to the situation in other states, it is becoming relatively easier for wealthy students to attend a state university in Alabama and relatively more difficult for poor students to do so.

110. Dr. Henry C. Mabry, III, who heads a private consulting firm in Montgomery, Alabama, also testified with respect to decreasing appropriations

---

7. Southern Regional Education Board, whose member states currently include sixteen Southeastern states.

for higher education and the rising cost of tuition. (May 4, 2004, Tr. at 133.)

111. Operations and Maintenance ("O & M") is a phrase referring to the universities' core spending and not the actual spending for the total operation of the university. (May 4, 2004, Tr. at 165.) O & M includes salaries, benefits and other kinds of maintenance costs, repairs, utilities, and recurring expenditures. *Id.* O & M does not include one-time appropriations or spending that would not be comparable from one university to another, such as agricultural extension and research funds which may be unique to Auburn but not applicable to the University of West Alabama.[8] (*Id.* at 166–67.)

112. From Fiscal Year ("FY") 1990 through FY 2003, O & M appropriations to universities in Alabama increased from about $500 million to $800 million, while federal funds grew from $200 million to a little over $600 million and tuition and fees grew from about $216 Million to about $613 Million. (Pls.' Ex. 124 (graph indicating key revenue sources for universities).) In other words, over thirteen years, federal funds and tuition and fees have increased by close to two hundred percent, while O & M appropriations by the legislature to universities increased by only sixty percent. (*Id.*) Alabama state appropriations to higher education clearly have not kept pace with other key revenue sources. (*Id.*)

113. The difference between university O & M contributions that have been made from the ETF and instruction, research, and public service expenditures has widened between FY 1990 to FY 2003. (Pls.' Ex. 127 (graph comparing core university spending and ETF O & M appropriations).) "The trend is continuing to widen between the amount that is appropriated to higher education for operations and maintenance and the expenditures in these key academic ...and service areas: instruction, research, and public service ...." (May 4, 2004, Tr. at 168–69.)

114. The total EFT expenditures for higher education have also decreased from 28.5% of total ETF appropriations to 26.1% of ETF appropriations. (May 4, 2004, Tr. at 173–175.) Additionally, although the amount appropriations to higher education from the EFT has increased between FY 1990 and FY 2003, appropriations for K–12, as expected, have grown more quickly. (*Id.* at 178–79); Pls.' Ex. 132 (indicating percentages and actual amounts of appropriations for K–12 and higher education from ETF.)

115. Dr. Donald E. Heller, Associate Professor and Senior Research Associate at the Center for Study of Higher Education, Pennsylvania State University, is the editor and/or author of numerous scholarly works concerning, among other things, issues of access to higher education, including *Condition of Access: Higher Education for Lower Income*

---

8. While the University of South Alabama and the University of Alabama both have medical schools, the expenditures for hospital related appropriations are not included in O & M as seen on the chart compiled by Dr. Mabry that depicts key revenue sources for Alabama's public universities. (May 4, 2004, Tr. at 167; Pls.' Ex. 124 (chart indicating sources of revenue for Alabama universities).) Dr. Mabry focused instead on the non-hospital related appropriations.

*Students* (2002) and *The States and Public Higher Education Policy: Affordability, Access, and Accountability* (2001). (Pls.' Ex. 90 (curriculum vitae of Dr. Heller).)

116. Dr. Heller testified that the underfunding of public education in Alabama, the resulting rising tuition and fees at its public universities, and the declining or disappearing availability of need-based state and institutional financial aid seriously impact black Alabamians in particular, as well as other low and middle income students, making it increasingly more difficult for those students to have access to enrollment in and completion of higher education. (May 5, 2004, Tr. at 161.)

117. Dr. Heller testified that a "long and extensive body of research" in the United States has established that two paths exist to ensuring access to higher education for low and middle income students, and that Alabama's lack of funding is erecting roadblocks to those paths. (May 5, 2004, Tr. at 161–62.) The first path is to offer universally low tuition, which historically is what has been done in most public colleges and universities in the nation. (*Id.*) The second path, in the absence of low tuition, is to offer need-based financial aid, which acts to lower the cost of education for students who are recipients of that aid. (*Id.*) As tuition increases, poorer students are less likely to be able to enroll in college; likewise, poor students who are already enrolled face dropping out when tuition increases. (*Id.* at 162–63.) Need-based financial aid can protect poorer students from the adverse affects of higher prices-*i.e.* as tuition goes up, need-based financial aid is directly related to whether or not poorer students are going to enroll in college and to persist and obtain a baccalaureate degree. (*Id.*)

118. The research is consistent with respect to those findings, and there is no reason to believe that the situation in Alabama would be any different from that in the rest of the country. (May 5, 2004, Tr. at 163.)

119. Blacks in Alabama have a great deal of financial need in order to be able to attend college, in comparison to white Alabamians and also in comparison to blacks residing in other states. Although students in about half of all families in the country qualify for Pell grants, the rough cutoff being about $45,000 annually in household income, keeping in mind that other factors related to net wealth and need are taken into account in calculating Pell grant eligibility, in Alabama fifty-eight percent of the white households and about seventy-eight percent of the black households would qualify for federal need-based Pell grants. (May 5, 2004, Tr. at 164–65; Pls.' Ex. 91 (Income Distribution of Alabama Households by Race, 2000 Census).) "So, the message here again is that blacks [in Alabama] are both poorer than whites overall and have higher need for financial aid and assistance to pay for college as well as being poorer than the rest of the nation." (May 5, 2004, Tr. at 165.)

120. Alabama has been increasing tuition at rates very consistent with most of the rest of the country, in the range of five to fifteen percent per year. (May 5, 2004, Tr. at 167; Pls.' Exs. 92 (graph indicating annual change in tuition and fees for comprehensive colleges) & 93 (graph indicating annual change in tuition and fees for

flagship universities).) "Unfortunately, over the last dozen years in this country we've greatly increased the cost of public higher education to students, and Alabama is no different than the rest of the country in effect." (May 5, 2004, Tr. at 167; Pls.' Exs. 92 & 93.)

121. The principal difference between Alabama and many other states, however, is that Alabama has decreased its amount of spending on need-based financial aid in the face of skyrocketing tuition costs. (May 5, 2004, Tr. at 169–70; Pls.' Ex. 94 (graph comparing Alabama's state spending on need-based grants per 19–24 year old to other regions of the United States).)

122. Alabama started from a much lower base than did any other part of the country, ranking, in 2001, forty-sixth out of fifty states in spending on need-based aid, and it actually decreased the amount of spending by a little over a third over those eleven years. (May 5, 2004, Tr. at 169–70; Pls.' Ex. 94.)

123. During 2003–04, the State appropriated only about $800,000 for need-based financial aid. (May 5, 2004, Tr. at 174.) For the period 1991 to 2001, with the exception of one year, 1997, the increase in tuition at Alabama's comprehensive public universities and at the University of Alabama, on a percentage basis, has been higher than the increase in state need-based financial aid. (May 5, 2004, Tr. at 173; Pls.' Ex. 95 (graph entitled Actual Change in Tuition and State Need–Based Grant Spending Per 18–24 Year Old—Alabama).) In fact, there are seven years in which the State actually cut spending on financial aid. (May 5, 2004, Tr. at 173; Pls.' Ex. 95.) In contrast, in all but three of those years, the other Southeastern states increased need-based financial assistance at a greater rate than tuition was increased. (May 5, 2004, Tr. at 174; Pls.' Ex. 96 (graph entitled "Annual Change in Tuition and State Need–Based Grant Spending Per 18–24 Year Old—Other SREB States").)

124. Alabama's lack of funding for need-based student aid has also had an adverse effect on federal funding. Because the state's level of funding has not achieved a certain level, the State of Alabama must turn back matching funds to the federal government. (May 5, 2004, Tr. at 174.) ACHE's 2002–03 annual report confirms this loss of federal assistance:

Because the Alabama Legislature during its Special Session in September, 2003 significantly reduced funding for the state's only need-based student aid program that receives federal matching funds, Alabama must return its $446,119 share of federal funds for 2003–2004, as the state no longer meets the required maintenance of effort necessary to qualify for the federal monies. *As a result, Alabama will not receive any federal need-based aid funds for 2003–2004 or 2004–2005.*

(Pls. Ex. 15 at 28 (ACHE October 1, 2002–September 30, 2003 annual report) (emphasis in original).)

125. The trend of rapidly increasing tuition and steadily decreasing need-based financial aid in Alabama corresponds with a growing gap between white and black Alabama high school graduates enrolling in the state's public four-year institutions of higher education. (May 5, 2004, Tr. at 176; Pls.' Ex. 97 (graph de-

picting enrollment rate of Alabama high school graduates in four-year public institutions by race, excluding historically black colleges and universities), 98 (graph depicting enrollment rate of Alabama high school graduates in four-year public institutions by race).)

126. Dr. Heller's analysis of scholarships awarded from 1999 to 2003 from the institutional budgets of Alabama's state universities, including ASU and AAMU, shows that for both white and black students, the average institutional scholarship amount given to white students has been steadily increasing, from about $500 to about $722, representing a forty-three percent increase in five years. (May 5, 2004, Tr. at 177–78; Pls.' Ex. 99 (graph depicting institutional scholarships per undergraduate student at Alabama public four-year universities).) Black students, however, received a smaller increase, from $547 to $660, a twenty-one percent increase, with the average institutional scholarship for black students actually dropping in the last three years. (May 5, 2004, Tr. at 177–78; Pls.' Ex. 99.) Thus, even though blacks need more financial aid, whites are on average receiving a greater amount. (May 5, 2004, Tr. at 178 ("At least based on the census data, we know that in Alabama blacks are poorer than whites, and yet whites are receiving more institutional aid in effect.").) Despite the financial barriers to attending college, however, the number of black Alabamians attending college continues to grow, even as the gap between whites and blacks increases. (*Id.* at 180.)

127. Dr. Heller emphasized the importance of financial resources to the ability of students to persist and graduate after they have enrolled in college. "Students who stop out of college are much less likely to ever earn a degree than students who enroll as a freshman and persist through, straight through, to get a bachelor's degree." (May 5, 2004, Tr. at 186.) Indeed, research indicates that students who work more than fifteen hours a week are less likely to attain a college degree. (*Id.*) "What happens is: students take a lower course load, they don't put as much time into their studies, they can't get ... as good grades, can't get the credits they need." (*Id.* at 187.) As a result, those students also lose eligibility for Pell grants. (*Id.*)

128. According to Dr. Heller, the adverse racial impact of Alabama's revenue and funding policies for higher education perpetuates the state's historical official policies of forcing African Americans into subordinate social and economic roles in the state's civil life:

[T]he big payoff in labor markets today is actually going to college and getting a bachelor's degree. If you go back a generation or two, the big payoff was the difference between dropping out of high school and getting a high school diploma. Back in the days when, you know, we used to quaintly call it a good middle class wage could be earned by a high school graduate, could go out and get a good job often in manufacturing, often in the public sector, earn a good wage without having to go to college. And in those days a generation or two ago, there wasn't as much of what economists call the college wage premium, the difference between a high school graduate, what he or she earns, and a college graduate. Well, in the last

two decades, that college wage premium has increased quite a bit, and what we see today the biggest jump is the difference between that high school diploma now and somebody getting a bachelor's degree..... There's not much of a premium in terms of earnings between staying in high school and dropping out of high school, but there's a huge premium when somebody goes on to college and gets a bachelor's degree.

(May 5, 2004, Tr. at 179–80.)

129. Elva Bradley, director of the Center for Teaching and Learning at the University of Alabama (the "Center"), also testified that need-based scholarships have failed to keep pace with the rising costs of higher education. (May 5, 2004, Tr. at 216–17.)

130. The Center provides assistance to students so that they can remain eligible to stay in school, based on both grade point average and satisfactory academic progress as it relates to financial aid. (May 5, 2004, Tr. at 216–17.) To receive financial aid, students must complete sixty-seven percent of attempted hours as they progress from freshman year to senior year. (*Id.* at 218.) When students fail to meet the sixty-seven percent requirement, the students lose eligibility for Pell grants and federal financial aid. (*Id.*) Students who have lost financial aid may appeal their suspension, and the Center provides assistance in that regard. (*Id.*)

131. Ms. Bradley testified that she estimates forty percent of students who come to the Center for assistance are black, although blacks constitute only fourteen percent of the total student body at the University of Alabama. (May 5, 2004, Tr. at 221.)

## III. Conclusions of Law

### A. *United States v. Fordice*

#### 1. The *Fordice* Standard

1. In *United States v. Fordice,* 505 U.S. 717, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992), the Supreme Court set forth a three-part constitutional analysis governing higher education desegregation lawsuits to determine "whether a state has fully met its remedial obligation" to dismantle policies and practices that inhibit free choice by students with respect to attending institutions of higher education. *Knight v. Alabama,* 14 F.3d 1534, 1540–42 (11th Cir.1994).

2. The first step requires the plaintiff to show that a policy "challenged as segregative is 'traceable' to decisions that were made or practices that were instituted in the past for segregative reasons, thus rendering it a vestige of discrimination." *Knight,* 14 F.3d at 1540. Put differently, "[o]nce it is determined that a particular policy was originally adopted for discriminatory reasons, the *Fordice* test inquires whether the current policy is 'traceable' to the original policy, or is 'rooted' or has 'antecedents' in that original policy." *Id.* at 1550.

3. The burden of proof to satisfy the "traceable to" prong lies on the plaintiff: "Where plaintiffs in a lawsuit contend that a state or other public actor has not discharged its duty to dismantle its former system of *de jure* segregated higher education, the burden of proof lies with the charging party to show that a challenged contemporary policy is traceable to past segregation." *Knight,* 14 F.3d at 1540–41.

4. The second step in the *Fordice* analysis requires that if the plaintiff

successfully demonstrates that a challenged contemporary policy is traceable to past segregation, the burden next shifts to the State to show that the policy no longer has continuing segregative effects. *Knight*, 14 F.3d at 1541. Upon proving that a challenged policy has no segregative effects, the State "is relieved of its duty to eliminate or modify the policy." *Id.* (citing *Fordice*, 505 U.S. at 738–39, 112 S.Ct. 2727).

5. If, on the other hand, the State is unable to show that the challenged policy has no continuing segregative effects, the State may nevertheless escape liability if "the State show[s] that there are no less segregative alternatives which are practicable and educationally sound." *Knight*, 14 F.3d at 1541; *see also Fordice*, 505 U.S. at 743, 112 S.Ct. 2727 ("[T]he State may not leave in place policies rooted in its prior officially segregated system that serve to maintain the racial identifiability of its universities if those policies can practicably be eliminated without eroding sound educational policies."). "This examination of the practicability and educational soundness of possible alternatives or modifications to a challenged policy constitutes the third step in the *Fordice* analysis." *Knight*, 14 F.3d at 1541–42. The state's burden to make such a showing, however, is heavy: "a court should consider the full range of alternative remedies, ... when determining which would achieve the greatest reduction in the identified segregative effects." *Id.* at 1541 (citing *Fordice*, 505 U.S. at 742–43, 112 S.Ct. 2727.)

6. The Eleventh Circuit has succinctly summarized the *Fordice* standard as follows:

Where plaintiffs show that a current policy is traceable to past segregation, and defendants fail to demonstrate either (1) that the policy, in combination with other policies, has no current segregative effects, or (2) that none of the full range of less segregative alternative remedies are practicable and educationally sound, defendants must adopt the practicable and educationally sound alternatives that will bring about the greatest possible reduction in the segregative effects. "If the state has not discharged [this remedial] duty, it remains in violation of the Fourteenth Amendment."

*Knight*, 14 F.3d at 1542 (citing *Fordice*, 505 U.S. at 727, 112 S.Ct. 2727).

## 2. Step One: Whether the Current Property Tax Structure is "Traceable To" Alabama's Prior System of Segregation

7. The Court first considers whether Plaintiffs have demonstrated that the constitutional restrictions placed on the property tax authority of both state and local governments are traceable to Alabama's prior *de jure* dual system.

8. Based on the extensive record before the Court, the Court finds that Plaintiffs have met their burden to demonstrate that the current ad valorem tax structure is a vestige of discrimination inasmuch as the constitutional provisions governing the taxation of property are traceable to, rooted in, and have their antecedents in an original segregative, discriminatory policy.

9. It is clear that the current tax structure in Alabama cripples the effectiveness of state and local governments in Alabama to raise funds adequate to support higher education. The Lid Bill and the low assessment ratios impede and restrict the ability of the

State and local governments from raising revenue from taxation of property.

### 3. "Continuing Effects" Step

10. Plaintiffs having satisfied their burden to show that the current tax structure is "traceable to" *de jure* segregation, the burden shifts to Defendants to show that the challenged provisions of the Alabama constitution do not have a continuing segregative effect. Knight v. Alabama, 14 F.3d at 1541.

11. Defendants contend that the property tax is not related to Alabama's system of higher education-i.e., that no nexus exists between the lack of funds derived from state and local property taxation and the effect on student enrollment decisions. Consequently, Defendants submit, the challenged provisions of the Alabama Constitution do not and cannot have a continuing segregative effect.

12. Plaintiffs contend that a causal nexus does indeed exist, arguing that the lack of property tax revenue has financially strained K–12 schools in Alabama, thereby requiring that the State allocate an increased proportion of the ETF to K–12. As a result of this inequitable distribution, Plaintiffs claim that tuition at Alabama's institutions of higher education has sky-rocketed and that funds available for need-based financial assistance have plummeted. Consequently, the ability of poorer students, who are disproportionately black, to attend college is adversely affected.

13. The Court appreciates Plaintiffs' argument, and agrees that the current property tax system in Alabama has a crippling effect on the ability of local and state government to raise revenue adequately to fund K–12 schools. Nevertheless, the Court cannot agree that the property tax structure stymies school choice in such a way that results in an unconstitutional denial of a student's right to make a decision unfettered by vestiges of discrimination.

14. The Court finds that the relationship between the funding of higher education and finding of K–12 is marginal insofar as ad valorem property tax is concerned. Put differently, the effect of the state's inability to raise revenue due to the challenged constitutional provisions is simply too attenuated to form a causal connection between the tax policy and any segregative effect on school choice.

15. Additionally, although the proportion of the ETF allocated to higher education has fallen since 1990, the actual amount of money paid to higher education has increased from $820,063,882 to $1,160,033,885 over that same period. (Defs.' Ex. 04–004.)

16. Moreover, insofar as Plaintiffs contend that the lack of funding for property taxes somehow works to frustrate the Court's prior remedial decrees, the Court finds that argument unavailing. Rather, the State has unbegrudgingly complied with the Court's remedial decrees, meeting all its obligations as ordered by the Court. Along those same lines, between the 1991–92 and 2002–03 academic years, black student enrollment and graduation rates at HWIs have increased considerably. (Defs.' Exs. 04–001 to 003.)

17. The Court concludes, therefore, that although the ad valorem taxation system in Alabama may be traceable to past discriminatory decisions, Defendants have satisfied their burden to demonstrate that the challenged pro-

visions of the Alabama constitution do not continue to have a segregative effect on student choice.[9]

### 4. *Hunter v. Erickson*

18. Plaintiffs also argue that the challenged provisions of the Alabama constitution violate the Fourteenth Amendment by restricting blacks' full participation in the political process. Specifically, Plaintiffs contend that those provisions were adopted for the racially discriminatory purpose of restricting the ability of black voters to influence property tax policy through ordinary lawmaking precesses both in the Alabama Legislature and in their local governments, especially in majority-black counties, municipalities, and school districts; therefore, the provisions at issue in the instant Motion unconstitutionally burden the ability of blacks to further their political aims.

19. Plaintiffs rely principally on *Hunter v. Erickson*, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), in which the Supreme Court struck down an amendment to the Akron, Ohio, city charter that restricted the city counsel's authority to enact an ordinance prohibiting racial, religious, or ancestral discrimination in housing without prior voter approval. *Hunter*, 393 U.S. at 387, 89 S.Ct. 557. All other ordinances, including ordinances preventing housing discrimination on grounds other than race or religion, could be enacted simply with the support of the Akron City Counsel. *Id.* at 389–90, 89 S.Ct. 557.

20. Although the Akron amendment was facially neutral, the real effect of the legislation was to "disadvantage those who would benefit from laws barring racial, religious, or ancestral discriminations as against those who would bar other discriminations or who would otherwise regulate the real estate market in their favor." *Hunter*, 393 U.S. at 391, 89 S.Ct. 557. The Supreme Court further reasoned that "the reality is that the law's impact falls on the minority" in that the

---

9. The Court expresses doubt that the matter before the Court even triggers *Fordice*. As the Eleventh Circuit stated in *Knight v. Alabama:*

> *Fordice* recognized as having segregative effects policies that "influence student enrollment decisions." In its discussion of several of the *Fordice* plaintiffs' specific challenges to Mississippi higher education policy, the Court offered examples of two broad categories of practices that can inhibit "free choice" by students as to university attendance. The first category comprises policies that have the effect of discouraging or preventing blacks from attending HWIs, examples of which include the maintenance of more stringent admissions requirements for HWIs than for [Historically Black Institutions ("HBIs")]. The second category consists of policies that discourage whites from seeking to attend HBIs, examples of which include: duplication of programs at HBIs and HWIs in the same geographic area; the assignment to HBIs of institution-

al missions that restrict them to programs of instruction that cannot effectively attract whites; and the failure to fund HBIs comparably to HWIs or to locate high-prestige programs at HBIs. As a result of such policies, disproportionate numbers of whites can satisfy their curricular desires at HWIs, and cannot satisfy them at HBIs, thereby discouraging them from choosing to attend HBIs.

14 F.3d at 1541.

Arguably, nothing currently at issue in this case fits into either of those two categories. Plaintiffs' claims that the State is not funding K–12 adequately and that as a result higher education is receiving a lesser share of the ETF, do not appear to fit the *Fordice* mold, let alone impede black students' free choice in determining which university to attend. The Court has previously imposed the requirements of *Fordice,* and the Court questions whether the issues presently before the Court trigger the application of *Fordice.*

amendment "places special burdens on racial minorities within the governmental process." *Id.*

21. Likewise, in *Washington v. Seattle School District No. 1*, 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982), the Supreme Court, following *Hunter*, struck down an initiative that was "carefully tailored to interfere with desegregative busing." *Washington*, 458 U.S. at 471, 102 S.Ct. 3187. In particular, that initiative prohibited school boards from requiring any student to attend a school other than the school nearest or next nearest to the student's residence. *Id.* at 462, 102 S.Ct. 3187. Like the ordinance in *Hunter*, the challenged initiative in *Washington* sought to frustrate attempts to provide legislation, *i.e.* busing for integration, designed to primarily benefit minorities. *Id.* at 472–74, 102 S.Ct. 3187. The Supreme Court therefore concluded that "[g]iven the racial focus of [the initiative], this suffices to trigger application of the *Hunter* doctrine." *Id.* at 474, 102 S.Ct. 3187.

22. The Court is unpersuaded that the instant case falls under *Hunter* and its progeny. Specifically, unlike the challenged legislation in *Hunter* and *Washington*, Alabama's property tax structure uniformly affects all citizens of Alabama, regardless of race, burdening all of the constituency by making it difficult to influence or change the property tax structure.[10]

23. Additionally, the purpose underlying the enactment of the legislation in both *Hunter* and *Washington* differs from the instant case. In those cases, the challenged legislation sought to eliminate the possibility of legislation specifically tailored to remedy discrimination and segregation. Here, on the other hand, the challenged constitutional provisions were not ratified with the intent to foreclose legislation specifically tailored to remedy discrimination. Accordingly, the Court does not find that the circumstances of this case trigger the applicability *Hunter* and its progeny.

24. In conclusion, therefore, although the provisions of the Alabama constitution may represent poor public tax policy, the Court finds that those provisions do not violate the Fourteenth Amendment.

### IV. Conclusion

ACCORDINGLY, the Court **DENIES** Plaintiffs' Motion for Additional Relief with Respect to State Funding of Public Higher Education [3205].

---

10. The Court notes that in 2003, Amendment 1 to the Alabama Constitution, which would have drastically overhauled the state's tax structure, including state and local property taxes, was overwhelmingly rejected by voters. (May 4, 2004, Tr. at 52, 161; May 5, 2004, Tr. at 115.)